Charles TRAVIS and Jean Travis, Plaintiffs,

v.

HARRIS CORP., Harris-Intertype Corporation, Sheridan Division and Bruno Machinery Corporation, Defendants.

No. 77–1158.

United States Court of Appeals, Seventh Circuit.

Argued May 25, 1977.

Decided Oct. 27, 1977.

Rehearing and Rehearing En Banc Denied Dec, 21, 1977.

Jeffery L. Lantz, Rodney H. Grove, Evansville, Ind., for plaintiffs.

Fred S. White, John D. Clouse, Evansville, Ind., for defendants.

Before FAIRCHILD, Chief Judge, WOOD, Circuit Judge, and MARKEY, Chief Judge.[1]

MARKEY, Chief Judge.

On May 23, 1973, while employed by Ohio Valley Container Corporation, Evansville, Indiana, (Ohio Valley), Travis was injured when his hand was caught in a die press machine (machine) as he tried to remove excess cardboard from its pincher bar. Under the Indiana Workmen's Compensation Act, 22 Ind.Stat. art. 3 (Burns 1973), designed to assure compensation of injured employees without litigation, Travis was paid $6,226.28.

On May 7, 1975, Travis and his wife (Travis) filed a complaint in Vanderburgh Superior Court, Vanderburgh County, Indiana, against Harris Corporation (Harris) and Bruno Sherman Corporation (Bruno), the alleged corporate successors to the original manufacturer of the machine, seeking damages in strict liability and for negligence in the design, manufacture, and distribution of the machine. On June 12, 1975, the cause was removed to the United States District Court for the Southern District of Indiana.

Both sides moved for summary judgment and, based on affidavits, exhibits and a hearing, the court granted summary judgment for Harris and Bruno.[2] We affirm.

## Background

The machine had been designed, manufactured and sold in 1957, sixteen years before Travis' injury,[3] by T.W. and C.B. Sheridan Company (Old Sheridan) to Inland Container Corporation (Inland), which, in turn, sold it to Ohio Valley in 1972. In 1964, eight years before Inland's sale of the machine to Ohio Valley, and nine years before Travis' injury, Old Sheridan had sold most of its assets to Harris-Intertype Corporation, which formed a new subsidiary, T.W. and C.B. Sheridan Company (New Sheridan) to receive those assets. The consideration paid to Old Sheridan consisted solely of $6,380,000 in cash. Prior to its voluntary dissolution, Old Sheridan distributed the cash to its shareholders. In 1968, New Sheridan was merged into Harris-Intertype, and in 1974, Harris-Intertype changed its name to Harris Corporation.

In the 1964 agreement for the sale of Old Sheridan assets, Harris agreed that it (or a subsidiary designated to receive the assets) would "on the Closing Date assume and agree to pay all liabilities of [Old] Sheridan, except as hereinafter provided . . ." The next section of the agreement provided: "On the Closing Date, Harris or the Subsidiary shall assume all of the liabilities of [Old] Sheridan *existing on the Closing Date* . . . except certain specified stockholder and tax liabilities and incidental expenses of the sales transaction itself." (Emphasis added.) Harris also provided an instrument at closing, on May 1, 1964, which stated that New Sheridan:

---

1. Chief Judge, U.S. Court of Customs and Patent Appeals, sitting by designation.

2. The parties having agreed that Harris-Intertype Corporation, Sheridan Division, was no longer amenable to suit, the district court dismissed that defendant. Travis has not appealed that ruling.

3. The cross motions for summary judgment, filed at the suggestion of the court, precluded determination of factual support for the claim that the involved machine was defective at its birth.

hereby assumes and agrees to pay, perform and discharge all debts, obligations, contracts and liabilities of [Old Sheridan] of any kind, character or description, whether accrued, absolute, contingent or otherwise, *as reflected on the balance sheets, books of account and other records* of [Old Sheridan] on the date hereof, . . . [Emphasis added.]

On September 6, 1972, prior to its change of name, Harris-Intertype sold to Bruno the assets used in the manufacture of the Sheridan Die-Cutting Press and related spare parts, including the good will related thereto. Section 9 of the agreement provided: "Buyer [Bruno] does not assume any liability or responsibility for defense of pending litigation claims or for any personal injury or physical property damage, whether arising before or after the date hereof, caused by or arising out of any Products delivered by Seller [Harris] prior to the date hereof *except to the extent altered by Buyer* . . . ." (Emphasis added.)

### Choice of Law

■ The parties and the district court agreed that Ohio law should be applied because the 1964 contract so provided. Though the contract may be interpreted under Ohio law, the legal effect of that agreement, and questions of traditional tort law unrelated to the contract, are to be determined in accord with the laws of Indiana, the situs of the injury and domicile of Travis. Having the principal interest in the resolution of the present issues, and under its conflict of laws principles, Indiana would apply its own law. Because the record reflects no difference in the laws of Ohio and Indiana applicable on this appeal, however, the choice of law is irrelevant to our decision.[4]

### Issue

The issue before us is whether, as a matter of law, Harris or Bruno may be held liable for Travis' injury. Its resolution depends on (1) whether the 1964 transfer of assets from Old Sheridan to New Sheridan reflected a corporate "merger" or "continuation," (2) whether that transfer made Harris liable under a "product line" theory, or (3) whether Harris or Bruno had an independent duty to warn Travis' employer about the machine.[5]

## OPINION

### (1) *"Merger or Continuation"*

■ As a general rule, a corporation that merely purchases for cash the assets of another corporation does not assume the seller corporation's liabilities. As this court recently pointed out in *Leannais v. Cincinnati, Inc., et al.*, No. 77–1066 (7th Cir. October 18, 1977), however, there are four generally recognized exceptions to the rule: (1) where there is an express or implied agreement of assumption; (2) where the transaction amounts to a consolidation or merger of the two corporations; (3) where the purchasing corporation is a "mere continuation" of the seller; and (4) where the transfer of assets to the purchaser is for the fraudulent purpose of escaping liability for the seller's debts. *Forest Laboratories, Inc. v. Pillsbury Co.*, 452 F.2d 621 (7th Cir. 1971), *Bazan v. Kux Machine Co.*, 358 F.Supp. 1250 (E.D.Wis.1973). Exceptions (1), (2), and (3) are asserted by Travis.

Regarding express or implied assumption of liability, it was found by the court below, and we agree, that "the claims presently being asserted by the plaintiffs were not reflected on the records of Old Sheridan as of May 1, 1964." The contract provision negating even an implied assumption is clear and unambiguous, and we cannot say that the court below was in error when it found that "New Sheridan, and ultimately Harris, did not agree to assume the products liability claims brought herein."

---

4. Travis argues, for the first time on appeal, that applicable Indiana law "may" be different from Ohio law. Travis, however, cites no relevant differences and we have found none.

5. Questions (1) and (2) affect Harris and Bruno together. Question (3) requires separate determination of whether either Harris or Bruno had a duty to warn.

■ A major factor in support of a finding of de facto merger is a transfer of stock as consideration. *Turner v. Bituminous Casualty Co.*, 397 Mich. 406, 244 N.W.2d 873 at 891 (1976) (Justice Coleman dissenting).[6] Where the assets are sold for cash, no basic, fundamental change occurs in the relationship of the stockholders to their respective corporations, *Lopata v. Bemis Co., Inc.*, 383 F.Supp. 342 at 345 (E.D.Pa.1974), and absent continuity of shareholder interest, the two corporations are strangers, both before and after the sale. *Turner, supra* at 891. Thus, the question of whether cash or stock is given in consideration for the assets is really a question of ownership. As Justice Coleman stated:

> Responsibility for disposition of the assets of a corporation ultimately rests with its owners, the shareholders. They must respond financially to claims of negligence. If ownership has changed by purchase since the act of negligence occurred, the succeeding owner is not liable, without more. [*Turner, supra* at 894.]

Here, no stock was transferred, in either direction, between Old Sheridan and Harris-Intertype.

■ Travis cites *Knapp v. North American Rockwell Corp.*, 506 F.2d 361 (3d Cir. 1974), for the proposition that, though all formal characteristics of a merger are not shown the nature and consequences of the transaction should be considered, a proposition with which we agree. In *Knapp*, however, stock was transferred as consideration for assets. Absent a transfer of stock, the nature and consequences of a transaction are not those of a merger.

■ Travis next points to a covenant by Old Sheridan to encourage its employees to remain in the employ of Harris, and a covenant by Harris to give Theodore Clark, Old Sheridan's president, an employment contract for a managerial position with Harris, as grounds for asserting that New Sheridan was a "mere continuation" of Old Sheridan.

As was said, however, in *National Dairy Products Corp. v. Borden Co.*, 363 F.Supp. 978 (E.D.Wis.1973), "the test is not the continuation of the business operation but the continuation of the corporate entity." The indicia of "continuation" are a common identity of stock, directors, and stockholders and the existence of only one corporation at the completion of the transfer. *Lopata, supra* at 345. It was held in *Lopata* that the hiring by defendant of the seller corporation's former vice president (who was also a director) was not enough to satisfy the test for "continuation."

In the present case, there was no identity of stock or stockholders, and no identity of directors. Though one of Old Sheridan's officers may have been employed by New Sheridan, there is no evidence that Clark ever served as an officer or director of New Sheridan. Nor was there a sole corporation remaining after the sale. The sale agreement provided that Old Sheridan was to continue normal business operations after purchase of its assets. Old and New Sheridan existed as distinct corporate entities for a week after the sale.

Thus, under the general rule and its exceptions, the facts of the present case fail to support application of either the "de facto merger" or the "mere continuation" exception. If liability is to be imposed on a purchasing corporation under such circumstances, legislatures must do it. Nothing in the briefs, in oral argument, or in our independent research, indicates to us that the courts of either Ohio or Indiana would be likely to modify so extensively the "de facto merger" and "mere continuation" exceptions as to apply them to the 1964 transfer of assets from Old Sheridan to Harris-Intertype and to thereby create a basis for imposition of liability on Harris or on Bruno.

### (2) *"Product Line"*

■ The "product line" theory is exemplified by *Ray v. Alad Corp.*, 19 Cal.2d 22,

---

**6.** In *Turner*, the court held that the same sale of assets by Old Sheridan to Harris created a de facto merger, refusing to recognize the distinction between cash and stock as consideration.

We disagree and find persuasive Justice Coleman's comprehensive argument in support of the general rule.

136 Cal.Rptr. 572, 560 P.2d 3 (1976). In that case, the plaintiff claimed damages for injury for a defective ladder manufactured and sold by the defendant's predecessor. Finding none of the usual exceptions by which liability may be imposed on a purchasing corporation, the California Supreme Court noted the approach taken by the United States Supreme Court in two labor law cases, *Howard Johnson Co. v. Hotel Employees*, 417 U.S. 249, 94 S.Ct. 2236, 41 L.Ed.2d 46 (1974) and *Golden State Bottling Co. v. NLRB*, 414 U.S. 168, 94 S.Ct. 414, 38 L.Ed.2d 388 (1973), wherein the Court refused to be bound by the general rules of state law governing liabilities of purchasing corporations, where application of those rules would unduly thwart the public policies underlying the applicable labor law. Analogizing tort law to labor law, the California Court held that:

> a party which acquires a manufacturing business and continues the output of its line of products under the circumstances here presented assumes strict tort liability for defects in units of the same product line previously manufactured and distributed by the entity from which the business was acquired. [136 Cal.Rptr. at 582, 560 P.2d at 11.]

The "product line" theory was asserted by plaintiffs in *Leannais, supra,* under facts similar to those here. In *Leannais* the record contained no indication that the courts of Wisconsin "have created, or would create, such a far-reaching exception to the non-liability of asset purchasers, so long the basis of economic decisions by its citizens." That analysis is equally applicable with respect to the courts of Ohio and Indiana, as is the broader statement in *Leannais* :

> In recent years, for a variety of reasons, many have thought it necessary to turn to the courts in search of solutions to social problems. Courts are ill-equipped,

however, to balance equities among future plaintiffs and defendants. Such forays can result in wide-ranging ramifications on society, the contemplation of which is precluded by the exigencies of deciding a particular case presented on a limited record developed by present parties. Absent compelling necessity, therefore, a Federal Court should not impose the policy pronouncements of the Supreme Court of one state upon the citizens of another. Nor are we at liberty to impose our view as to what the law of Wisconsin should be. [*Leannais, supra,* slip op. at 7–8.]

Whether or not "the circumstances here presented" could be shown similar to those present in *Ray, supra,* we find no basis for adding to the laws of Ohio or Indiana a "product line" theory on which Harris or Bruno might be held liable.[7]

### (3) *Failure to Warn*

 Under traditional tort law principles, a duty to warn arises when a relationship exists between him upon whom the duty falls and the dangerous situation to be warned against. Because the "duty to warn" issue was not clearly presented below—Travis having referred to a "duty to remedy defects" arising from a service call at Inland and continued manufacture of die presses—the issue necessarily received only summary treatment in the district court's order.[8]

Citing *Shane v. Hobam, Inc.,* 332 F.Supp. 526 (E.D.Pa.1971), Travis argues here that a duty to warn of defects arose because New Sheridan used Old Sheridan's name, acquired its good will, and assumed a continuing service responsibility toward Old Sheridan's past customers. The mere continuation of a name and acquisition of good will cannot of themselves create a duty to warn.

---

**7.** As indicated in *Leannais,* Wisconsin has product liability under study. The Oregon legislature has recently passed B-Eng. HB3039, limiting the period within which product liability claims may be asserted. The California Citizens Commission on Tort Reform is studying the effects of product liability litigation on in-

surance premiums and on small manufacturers. Machine Tool Industry Study (to accompany Option Paper 1, CCCTR Issue 3) for California Citizens Commission on Tort Reform.

**8.** The briefs for Travis, below and on appeal, were of little assistance.

Nothing in the record supports the allegation respecting assumption of service responsibility. Moreover, in *Shane*, notwithstanding the continued operation of the seller corporation as a division of the purchaser and the purchaser's expectation of servicing machines previously sold by the seller, the court denied summary judgment to the plaintiff, there being no evidence that the purchaser corporation had every serviced the involved machine or had any knowledge of defects in the machine.

Succession to a predecessor's service contracts, coverage of the particular machine under a service contract, service of that machine by the purchaser corporation, a purchaser corporation's knowledge of defects and of the location or owner of that machine, are factors which may be considered in determining the presence of a nexus or relationship effective to create a duty to warn. *Leannais, supra* slip op. at 10.

Travis' sole basis for alleging the required relationship here, however, is a copy of a report of a service call made at Inland in 1968 by an employee of New Sheridan. Travis would have us hold that a special relationship was somehow created between New Sheridan and Ohio Valley, or between New Sheridan and the involved machine, not through an ongoing or continuous service relationship between the two companies resulting from the sale of assets or its aftermath, but through a single visit by one of New Sheridan's servicemen to Inland, eleven years after the involved machine was sold to Inland, four years after the sale of assets, four years prior to the sale of the machine to Ohio Valley, and five years prior to Travis' injury.

Travis does not allege that New Sheridan had the required relationship with Inland, or if such relationship existed, how it could have passed to Ohio Valley. The most that could be shown by the service call report is that the machine was in need of maintenance and repair. There is no allegation that New Sheridan knew of defects in design, manufacture, or distribution of the involved machine, or knew that that machine had been sold to Ohio Valley.

There were no allegations below of prior injuries incurred on this press or on others of the same design. In his reply brief on appeal, Travis refers to suits presently pending against Harris, without indication that such suits involve machines of the same design. Considering the argument, though raised initially on appeal we think the mere existence of such present suits would not themselves imply knowledge on the part of Harris, prior to Travis' injury in 1973, that the design of the particular model press here involved might be defective. Nor would the existence of such suits imply knowledge on the part of Harris of the location of the involved machine at Ohio Valley.

Absent knowledge of defects, nothing is known to warn against. Absent knowledge of the location of a machine, there is no known entity to warn. It is undisputed that there was no service contract and that the serviceman's 1968 visit was made in response to a call from Inland. No chain of liability having been created by the sale of assets, New Sheridan on this record was, vis-à-vis the Inland call, in the shoes of any service organization called upon to repair a machine. Whether the single service call might have created the required relationship with Inland is not before us. It was clearly insufficient to create such relationship with Ohio Valley. Hence, we hold that the facts of this case fail to raise a duty, on the part of Harris, to warn Ohio Valley.

Travis conceded that the claim against Bruno was brought solely on the possibility that Bruno may have negligently or improperly modified, altered, or serviced the involved machine before the accident. The unchallenged affidavit of Bruno's General Manager stated unequivocally that at no time had Bruno ever modified, altered, or serviced the machine. The record thus reflects not the slightest nexus upon which Bruno could be found to have owed any duty to warn Travis' employer.

Accordingly, the judgment of the district court is affirmed.

FAIRCHILD, Chief Judge, dissenting.

In this case, as in *Leannais v. Cincinnati, Inc., et al.*, No. 77–1066 (7th Cir. October 18, 1977), this court assumes that a state, here Indiana, will apply to strict products liability traditional limitations upon liability of a successor company for injuries caused by its predecessor to four circumstances: (1) when the successor expressly or implicitly agrees to assume liability, (2) when the acquisition was by merger or consolidation of the companies, (3) when the successor is a "mere continuation" of the predecessor, or (4) when the acquisition had a fraudulent purpose to allow the predecessor to escape liability for its obligations. This rule originated long before the development of strict liability in tort and, as I noted in my dissent in *Leannais*, it is not compatible with full effectuation of the principle underlying strict liability.

Indiana, whose law controls this case, is committed to the policy of strict liability in tort. *Ayr-Way Stores, Inc. v. Chitwood*, 261 Ind. 86, 300 N.E.2d 335 (1973); *Perfection Paint v. Konduris*, 147 Ind.App. 106, 258 Ind.App. 681 (1970); *Cornette v. Searjeant Metal Products, Inc.*, 147 Ind.App. 46, 258 Ind.App. 652 (1970). *See also Greeno v. Clark Equipment Co.*, 237 F.Supp. 427 (N.D. Ind.1965). In a recent decision, one of its courts explained:

> Justifications for this form of strict liability generally recognize . . . that the manufacturer and supplier can best bear and spread the losses caused by their defective products. Presumably an "insurance factor" is, or can be, reflected in the price of [the] goods. . . .
>
> To the extent that these policies underpin the rule of law, traditional distinctions between purchasers, users and bystanders appear superfluous. *Chrysler Corp. v. Alumbaugh*, 342 N.E.2d 908, 916, *modified on other grounds*, 348 N.E.2d 654 (Ind.App.1976).

Thus, as in *Leannais*, the state courts have made a strong commitment to the policy underlying strict products liability, and have not produced any decision applying the traditional limitations upon successor liability to strict liability for harm caused to the user of an unreasonably dangerous product.

In these circumstances, a court in our position, with the duty to apply Indiana law, should apply the rule it considers the soundest.