**CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND, Central States, Southeast and Southwest Areas Health and Welfare Fund and Robert Baker, Trustee, Plaintiffs,**

v.

**CENTRAL TRANSPORT, INC., and Central Cartage Co., Defendants.**

No. 91 C 6232.

United States District Court, N.D. Illinois, Eastern Division.

Aug. 25, 1994.

Francis Joseph Carey, Cent. States Law Dept., Rosemont, IL, for Robert J. Baker, trustee.

Grady B. Murdock, Jr., Earl L. Neal & Associates, Leonard R. Kofkin, Donald Joseph Vogel, Fagel & Haber, Chicago, IL, Patrick A. Moran, Evans & Luptak, Detroit, MI, for Cent. Transport Inc., Cent. Cartage Co.

## MEMORANDUM OPINION AND ORDER

LEINENWEBER, District Judge.

### BACKGROUND

Plaintiffs, Central States, Southeast and Southwest Areas Pension Fund ("Pension Fund"), Central States, Southeast and Southwest Areas Health and Welfare Fund ("Health & Welfare Fund"), and the trustee of both funds, Robert Baker, (hereinafter collectively the "funds"), have brought an action against defendants, Central Transport, Inc. ("Transport") and Central Cartage Co. ("Cartage"), to collect audit-revealed delinquent contributions from both defendants and to enforce a bankruptcy plan of reorganization and a guarantee against Transport. The funds claim that Transport and Cartage are liable for such delinquent contributions under section 515 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1145.

Plaintiffs are multi-employer funds and third-party beneficiaries to collective bargaining agreements negotiated between participating employers and local unions. The funds provide pension coverage and health benefits to employees covered by the collective bargaining agreements. Transport and Cartage are participating Michigan corporations. Both companies are parties to the National Master Freight Agreement ("NMFA")—the collective bargaining agreement between the local unions and the participating employers—and various addenda and contracts that supplement the NMFA.

The funds move the court to grant a motion for summary judgment on three of the four counts of their Second Amended Complaint ("complaint"). With regard to Count I, the funds have moved for summary judgment against both Transport and Cartage. In Count I, the funds seek to collect audit-revealed, delinquent contributions from both defendants. The funds move for summary judgment in Counts III and IV solely against Transport. From Transport only, the funds seek to recover a debt originally incurred by a company that underwent bankruptcy reorganization and subsequently merged with Transport. The funds seek to recover this amount on two alternative theories. In Count III, the funds seek to enforce Transport's guarantee of the delinquent contributions. In Count IV, the funds seek to collect the delinquent contributions directly from Transport as an "employer," as defined by ERISA, and as the principal debtor. Addi-

tionally, Transport moves the court for summary judgment against the funds in Counts III and IV. In an Order entered July 17, 1992, this court granted the funds' motion for summary judgment against both defendants on Count II. Count II, therefore, is not at issue in this motion for summary judgment.

## I. Jurisdiction

The first question the court must consider is whether it has jurisdiction to hear this case. With respect to Count I ("audit-revealed delinquent contributions"), sought from each defendant pursuant to section 515 of ERISA, the court has jurisdiction over this matter as provided in section 502(e)(1) of ERISA (29 U.S.C. § 1132(e)(1)). In pertinent part, section 502(e)(1) provides that "the district courts of the United States shall have exclusive jurisdiction of civil actions under this subchapter brought ... by a fiduciary." 29 U.S.C. § 1132(e)(1); *Laborers Health & Welfare Trust Fund v. Advanced Lightweight Concrete Co.*, 484 U.S. 539, 547, 108 S.Ct. 830, 835, 98 L.Ed.2d 936 (1988) ("the liability created by Section 515 [of ERISA] may be enforced by the trustees of a plan by bringing an action in Federal District Court pursuant to Section 502 [of ERISA]").

The funds assert that jurisdiction under Counts III and IV is proper either under section 502(e)(1) of ERISA, under federal common law pursuant to 28 U.S.C. § 1331, or under the court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367. Complaint at ¶ 26. Transport denies such jurisdiction exists. Answer to Second Amended Complaint ("answer") at ¶ 26.

The court also properly has original jurisdiction over the guarantee claim. *See Laborers' Pension Fund v. Concrete Structures of the Midwest, Inc.*, 999 F.2d 1209, 1211 (7th Cir.1993). In *Laborers' Pension Fund*, a general contractor had agreed to guarantee the payments of its sub-contractor. When the sub-contractor fell behind in its contribution obligations, the pension fund secured a note from the sub-contractor's owner (not the general contractor). *Id.* After making several payments, the sub-contractor and its owner went bankrupt. *Id.* The general contractor was obligated by a previous guarantee agreement with the pension funds to make payments for the sub-contractor if the sub-contractor failed to make contributions. *Id.* The court held that the general contractor was liable for the guarantee under section 515 of ERISA. *Id.* Despite the fact that the payments sought from the general contractor were pursuant to a guarantee, the court, nevertheless, held that the pension fund had the right to collect "delinquent contributions" under section 515 of ERISA. *Id.* Because the guarantee claim sought to be enforced by the pension funds was for delinquent contributions, jurisdiction was proper under section 502(e) of ERISA. *Id.* Like the pension funds in *Laborers' Pension Fund,* in Count III plaintiffs also seek to enforce a guarantee of delinquent contribution payments. Accordingly, the court has jurisdiction under section 502(e) of ERISA. *Id.*

Finally, jurisdiction is also proper over Count IV of the complaint. In the employer contribution claim, the funds seek to recover delinquent contributions based on a successor liability theory. *See* complaint at ¶ 41. The Seventh Circuit Court of Appeals has tacitly approved jurisdiction in successor liability cases under section 502 of ERISA. *See Upholsterers' Union Pension Fund v. Artistic Furniture,* 920 F.2d 1323, 1328 (7th Cir.1990) (recognizing the statutory authority to recover delinquent contributions under ERISA in a successor liability action). Because jurisdiction lies for claims to recover delinquent contributions on a theory of successor liability, the court has jurisdiction over Count IV of the complaint. *Id.*

## II. Summary Judgment Standard

Summary judgment is appropriate if no issue of material fact exists warranting a trial on the merits. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). No material issue of fact exists for trial if, in viewing the evidence in a light most favorable to the non-moving party, a reasonable jury could not return a verdict in the non-movant's favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). The party moving for summary judgment bears the initial burden of supporting its motion

that no genuine issue of material fact exists. *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2553. If that burden is met, the non-moving party must come forward with specific facts to rebut that showing. The party resisting the motion "may not rest upon mere allegations or denials of his pleadings" to avoid summary judgment. *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2514. The court will examine the funds' summary judgment motion in a light most favorable to defendants, and will examine Transport's summary judgment motion in a light most favorable to the funds.

III. The Funds' Motion for Summary Judgment Against Transport and Cartage for Audit–Revealed Delinquent Contributions (Count I)

As an initial matter, it should be noted that Transport has incorporated by reference the arguments included in Cartage's Memorandum in Opposition to Plaintiffs' Motion for Summary Judgment. Here, although a majority of the arguments in opposition to summary judgment on Count I are presented in Cartage's memorandum, since Transport incorporated those arguments by reference, the court will refer to them as "defendants'" arguments.[1]

In Count I, the funds seek to recover audit-revealed delinquent contributions from both defendants. The amounts sought in the funds' motion for summary judgment against both Transport and Cartage can be divided into three categories. The funds seek to recover amounts owed for: 1) non-union casual employees; 2) regular employees for vacations, holidays, and sick days; and 3) employees whom defendants argue were "probationary." In an attempt to stave off summary judgment, defendants argue that: 1) the parties to the collective bargaining agreement did not intend contributions to be made for non-union casuals; 2) contributions are linked to productivity and, therefore, amounts are not owed for regular employees for vacations, holidays, and sick days; and 3) certain employees had extended their probation period and, thus, contributions were not

owed for those employees. The court will address each of the funds' claims, and defendants' arguments in response to these claims, in turn.

**A. Non–Union Casual Employees**

The first issue presented in the funds' motion for summary judgment concerns contributions due from defendants for non-union casual employees. In its 1992 decision, the court ruled that the NMFA, on its face, requires contributions on "each casual employee" including non-union employees. *Central States SE & SW Areas Pension Fund v. Central Transport, Inc.,* 1992 WL 175499 at *1, 1992 U.S.Dist. LEXIS 10768 at *2 (N.D.Ill.1992) (*citing* NMFA Art. 3, § 1(e)(2)). The Seventh Circuit Court of Appeals has also found that the NMFA requires contributions for non-union employees. *Central States SE & SW Areas Pension Fund v. Gerber Truck Serv., Inc.,* 870 F.2d 1148, 1150 (7th Cir.1989) (*en banc*). Defendants argue that they should have the opportunity to prove that contributions are not required for non-union casual workers. Additionally, defendants contend that they relied on the provisions of a Settlement Agreement ("Settlement Agreement") entered into with Central States to their detriment. Because the court has already addressed these arguments as they relate to the issue of non-union casual employees, in substance, defendants are asking the court to reconsider its 1992 Order.

The court will not do so. Any request for reconsideration of the 1992 decision is procedurally defective. For the court to reconsider that decision, defendants must file a motion to reconsider under Local Rule 12(c) stating with particularity the grounds and relief requested. For this reason alone, the court need not consider defendants' arguments regarding non-union casual employees.

■ Furthermore, even if defendants' memoranda were to be construed as a motion for reconsideration, the arguments put forth are not substantively persuasive. Motions for reconsideration serve a limited function and will be granted only when

---

1. Where this characterization is inappropriate— *i.e.,* where Cartage's memorandum contains arguments specifically related to itself, and where

the arguments are unrelated to Transport—the court will refer only to Cartage.

the Court has *patently misunderstood* a party, or has made a decision outside the adversarial issues presented to the Court by the parties, or has made an error not of reasoning but of apprehension. A further basis for a motion to reconsider would be a controlling or significant change in the law or facts since the submission of the issue to the Court. Such problems rarely arise and the motion to reconsider should be equally rare.

*Bank of Waunakee v. Rochester Cheese Sales, Inc.,* 906 F.2d 1185, 1191 (7th Cir.1990) (*quoting Above the Belt, Inc. v. Mel Bohannan Roofing, Inc.,* 99 F.R.D. 99, 101 (E.D.Va. 1983)) (emphasis added).

■ The court has not patently misunderstood defendants' argument. The issue before the court in the 1992 motion for summary disposition was whether the NMFA required contributions for non-union casuals. *See Central States,* 1992 WL 175499 at *1, 1992 U.S.Dist. LEXIS 10768 at *2. In that motion, defendants argued that the parties did not intend to have contributions made for non-union casuals. *Id.* The court ruled that the plain meaning of the language required such contributions. *Id.* As was stated in that ruling, "[t]he court will not disregard the plain meaning of the NMFA to give effect to what the employers now claim is their intent." *Id.* (*citing Robbins v. Lynch,* 836 F.2d 330 (7th Cir.1988)).

Subjective intent is irrelevant to the issue of interpreting the collective bargaining agreement. As third-party beneficiaries to the agreement, the funds are "entitled to enforce the writing without regard to the understandings or defenses applicable to the original parties." *Central States SE & SW Area Pension Funds v. Gerber Truck Serv., Inc.,* 870 F.2d 1148, 1149 (7th Cir.1989). The court could not have patently misunderstood the parties because the sole focus of the decision was the plain language of the NMFA. The nature of the decision did not allow for the possibility of a misunderstanding of the parties' intent. The plain language of the document is controlling. Defendants' old argument is again unpersuasive.

Additionally, the decision was not based on issues outside those framed by the adversarial parties. As noted above, the issue then was precisely the same issue presented by the adversaries now, namely: whether the NMFA requires contributions for non-union casuals. The answer, both then and now, is that it does.

■ With respect to the NMFA language, no facts or law have changed since the time of the 1992 summary judgment decision. The language of the NMFA has not changed since 1992, nor could it have. The language considered by the court was the language as it existed then. Any subsequent changes in that agreement are simply not relevant. Also, the basic rules of contract interpretation are well settled. Where the language is unambiguous, the plain meaning is to be given effect. *See Nat'l Fidelity Life Ins. Co. v. Karaganis,* 811 F.2d 357, 361 (7th Cir. 1987); *Nat'l Diamond Syndicate, Inc. v. UPS,* 897 F.2d 253, 256 (7th Cir.1990) (*citing Fields v. Franklin Life Ins. Co.,* 115 Ill. App.3d 954, 71 Ill.Dec. 776, 778, 451 N.E.2d 930, 932 (5th Dist.1983)). Thus, there are no arguments that persuade the court to reconsider its 1992 decision even if defendants had properly requested the court to do so.

In addition to rejecting defendants' argument that the NMFA does not require contributions for non-union casuals in its 1992 decision, the court also rejected defendants' contention that relying on the Settlement Agreement to their detriment was grounds for relief. *See Central States,* 1992 WL 175499, 1992 U.S.Dist. LEXIS 10768; Defendants' Brief in Opposition to Plaintiffs' Motion for Summary Disposition at 12–13 (filed April 27, 1992). Just as defendants failed to show why the court should reconsider its 1992 decision that the NMFA requires contributions for non-union casual employees, defendants have also failed to provide the court with any reason to reconsider its decision with respect to the issue of reliance on the Settlement Agreement. Defendants simply reassert the same argument that Cartage advanced in response to the 1992 motion for summary judgment. Defendants' argument that they relied on the Settlement Agreement to their detriment is as unpersuasive now as it was then.

**1408**

Defendants do present one new argument with respect to the issue of non-union casual employees. They contend that the issue of non-union workers should have been resolved through arbitration as provided for in a participation agreement entered into with the funds.

 "Federal policy favors the enforcement of private arbitration agreements." *St. Mary's Med. Center v. Disco Aluminum Products*, 969 F.2d 585, 587 (7th Cir.1992). The federal policy in favor of arbitration over litigation, however, is not "an absolute preference." *Id.* Courts may refuse to enforce arbitration agreements when the right to arbitrate has been waived. *Id.* In determining whether a party has waived the right to arbitrate, the court must examine the facts and circumstances of each particular case. *Id.* at 588. The essential question is whether the party alleged to have defaulted has acted inconsistently with the right to arbitrate. *Id.*

Like the instant case, *St. Mary's Med. Center* also involved a contract dispute which, according to the defendant, was subject to an arbitration clause. 969 F.2d at 586. The defendant in that case participated in litigation for ten months before it moved the court to dismiss the claim or alternatively to grant summary judgment. *Id.* The court held that submitting the claim to the district court for a summary judgment ruling or on a motion to dismiss was inconsistent with a desire to arbitrate. *Id.* at 589. The court reasoned that a "party may not normally submit a claim for resolution in one forum and then, when it is disappointed with the result in that forum, seek another forum." *Id.*

 In the present case, defendants have acted inconsistently with a desire to arbitrate, thus leading the court to conclude that the right has been waived. Defendants responded to the funds' first motion for summary judgment and allowed the court to enter an order without even mentioning the availability of arbitration. It is only now, in response to the present motion for summary judgment, that defendants have expressed a

desire to resolve the issue through arbitration. Defendants "had a right to insist on arbitration rather than litigation." *See Id.* at 591. By allowing the court to rule in 1992 on matters that defendants now claim should be subject to an arbitration clause, defendants have acted inconsistently with their right to arbitrate. *See Id.*

 Waiver of a party's right to arbitrate may be found even if the failure to exercise that right has not prejudiced the non-defaulting party. *Id.* Prejudice is to be considered by the district court as one relevant factor in determining whether there has been a waiver of the right to arbitrate. *Id.*

 In this case, the funds *were* prejudiced by defendants' delay in asserting arbitration as a defense. By delaying the demand for arbitration, defendants were able to obtain discovery that they would not necessarily have been entitled to had there been an arbitration proceeding. *See Id.* Furthermore, the funds expended resources litigating that they otherwise would not have had to had the arbitration process moved forward. *Id.* Because defendants did not mention their right to arbitrate in their response to the motion for partial summary judgment filed against them in 1992, they have not preserved that right. Given this fact, and given the fact that defendants have not shown that they would be substantially prejudiced (and cannot show that the funds would not be prejudiced) by such a ruling, the court rules that defendants' defense of arbitration has been waived.

 Finally, Cartage requests that the court re-open discovery if, as has occurred, the arbitration argument is rejected.[2] Cartage asks that the court re-open discovery: a) so that it can show that it did not intend to make contributions on behalf of non-union employees, and b) so that it may have an opportunity to challenge the audit findings. The court finds neither of these arguments to be persuasive.

---

**2.** Transport has incorporated by reference Cartage's entire memorandum, including this portion of the Memorandum in Opposition to Summary Judgment. However, the arguments advanced

by Cartage in this portion of its response brief are not applicable to Transport. The court, therefore, only refers to Cartage with respect to these arguments.

The court will not re-open discovery in order to give Cartage an opportunity to show the subjective intent of the parties to the collective bargaining agreement. As has been noted, subjective intent is irrelevant to the issue of interpreting the collective bargaining agreement. As third-party beneficiaries, the funds can enforce the plain meaning of the contract. *See Gerber Truck Serv., Inc.,* 870 F.2d at 1149. A discovery request that merely seeks to prove the subjective intent of the parties is not helpful with regard to this issue and, therefore, is denied. *See Id.*

Cartage's other argument in favor of re-opening discovery is that it claims that it has not had ample time to examine the funds' audit findings. Cartage claims that it *"just received"* its first opportunity to test by discovery the audit conclusions of" the funds. Cartage's Memorandum in Opposition to [the] Motion for Summary Judgment ("Cartage's Response") at 11 (emphasis added). Cartage further states that "the opportunity could not by definition arise until the *recent completion of the audit by"* the funds. *Id.* (emphasis added). As the funds point out, however, the final portion of the audit findings was attached to plaintiffs' Third Set of Requests for Admission Directed at Central Cartage Co., which was served on March 4, 1993—over eleven months before the present motion was filed. *See* Central States' Reply Memorandum in Support of its Motion for Summary Judgment Directed at Central Cartage ("Central States' Reply to Cartage") at 2; Central States' Reply to Cartage, Ex. B. Further, Cartage responded to the audit findings on May 7, 1993. *Id.* The court simply disagrees that at the time Cartage's Response was filed the audit had only "recently" been completed and that Cartage had "just received" the findings. Cartage has had ample time to examine the funds' audit findings. Indeed, given the nature of its response filed on May 7, 1993, it appears that Cartage actually did examine the audit findings. Cartage's request to re-open discovery is, therefore, denied.

For the reasons stated in both the court's 1992 Order and this ruling, summary judgment with regard to the amounts owed for non-union casual employees is granted.

**B. Contributions for Vacation Days, Holidays, and Sick Days on Behalf of Regular Employees**

■ The funds request summary judgment against both defendants with regard to the issue of contributions due for non-casual employees for vacation days, holidays, and sick days. Whether contributions are due depends on the language of the collective bargaining agreement. As has already been noted, the funds, as third-party beneficiaries, can enforce the plain meaning of the agreement without regard to the subjective intent of the parties. *See Gerber,* 870 F.2d at 1149. The terms of the NMFA provide in Articles 54 and 55 that employers must contribute for regular employees for each day "worked or compensated." *See* Central States' Reply to Cartage at 11. Although vacations, holidays, and sick days are not days on which regular employees "worked," they are days for which regular employees are "compensated." Therefore, the plain language of the agreement requires that the employers make contributions on behalf of the employees for vacations, holidays, and sick days because they are "days compensated."

Defendants argue that it was not the intention of the parties to the bargaining agreement to make contributions on behalf of employees for these days. However, once again, whether the parties intended something other than the plain meaning of the agreement is irrelevant. *Gerber,* 870 F.2d at 1149. Defendants maintain that the holding in *Connors v. Consolidation Coal Co.,* 866 F.2d 599, 601 (3d Cir.1989), supports its proposition that contributions should be linked to productivity and, consequently, contributions are not required for days on which workers are not productive—*i.e.,* days on which employees are paid but do not work. However, the funds correctly point out that in *Connors,* the collective bargaining agreement required that employers make contributions to the trust funds for all hours worked in a classified job. The collective bargaining agreement explicitly stated that hours not worked should not be reported.

*Id.* The Third Circuit Court of Appeals, therefore, found that the contributions to trust funds were linked to productivity. *Id.*

In the instant case, the collective bargaining agreement requires contributions for days based on compensation, not based on productivity. This distinction is crucial and makes the facts of the present case distinguishable from the facts in *Connors.* The court rules that the plain meaning of the agreement will be given effect and that the funds' motion for summary judgment is be granted with respect to the issue of contributions for vacation days, holidays, and sick days on behalf of regular employees.

### C. Probationary Employees

In response to the funds' motion for summary judgment, defendants argue contributions are not required for those employees who have extended their probationary period. To extend the probationary period of a new employee beyond the initial 30–day period, the employee and the union must execute a written agreement stating the parties' intention to do so. *See, e.g.,* Central States' Reply to Cartage at 13–14.

In this case, the funds have calculated liability by counting an initial period of 30 days for each employee and then assessing contributions for the time worked or compensated after the initial period. The funds' presumption is that absent a written agreement between the union and the employee, a newly hired employee's probationary period would end after the initial 30 days. Cartage disputes the funds' calculation of damages by this method, but Cartage has not offered documentation showing that the employees have executed the required written agreements stating the parties' intent to extend the probationary period.[3] *See* Affidavit of Hal Briand. In short, Cartage has merely rested on the allegations of its pleadings and its filings and has not set forth specific facts that demonstrate that a genuine issue of fact exists with regard to this issue. For this reason, Cartage's argument cannot stave off summary judgment on this point.

Transport makes one unique argument in its effort to prevent the court from entering summary judgment in favor of the funds on this count. Specifically, Transport argues that an addendum to the NMFA that it executed with the funds shows that contributions are not intended for "holidays, vacations, sick days, probationary employees and non-union casuals." *See* Transport's Memorandum in Opposition to Plaintiff's Motion for Summary Judgment ("Transport's Reply"). In arguing that it is exempt from making contributions for all of these categories of employees, Transport refers to the clause in the addendum that provides that "[p]ension payments [were] to be made on a daily basis or by tour of duty as required. . . ." *Id.* Without explanation, Transport claims that this provision shows that the funds are not entitled to contributions for any of the above-mentioned categories. The court finds no support for this proposition. Payments can be made for holidays, vacations, sick days, probationary employees, and non-union casuals "on a daily basis." Transport effort to stave off summary judgment on this point fails.

Summary judgment is entered against both Cartage and Transport, and in favor of the Pension Fund and the Health & Welfare Fund on Count I.

Both Cartage and Transport are liable for delinquent contributions: 1) for non-union casual employees, 2) for employees who do not have supporting documentation regarding probation extension, and 3) for vacation days, holidays, and sick days on behalf of regular employees.

Transport has not disputed the amount that the funds allege is owed to them, and so the court rules that it must pay $16,563.20 to the Pension Fund, and $13,065.60 to the Health & Welfare Fund. Additionally, Transport is ordered to pay to each of the funds the greater of double interest, or single interest plus liquidated damages, as well as all audit costs and attorneys' fees. Furthermore, pursuant to 29 U.S.C. 1132(g)(2),

---

**3.** Here, again, although Transport has incorporated by reference Cartage's reply to the motion for summary judgment, Cartage only disputes the calculations that the funds's claim that it (Cartage) owes. The defendant referred to with regard to this issue is, therefore, only Cartage.

Transport is ordered to pay the costs reasonably incurred by the Pension Fund and the Health & Welfare Fund in connection with this action.

Cartage has disputed the amounts owed in the challenged categories. However, Cartage's dispute with regard to the amounts owed are not addressed in a Local Rule 12(n) statement.[4] Cartage disputes certain calculations of the funds, but does not allege specifically which amounts are controverted. Because of its filing deficiency, the amounts presented by the funds are taken as admitted. The court rules that Cartage must pay to the Pension Fund $1,783,383.40 for non-union casuals and $161,243.20 for audit-revealed delinquencies. Additionally, the court rules that Cartage must pay $52,504.20 for audit-revealed delinquencies to the Health & Welfare Fund.[5] Finally, pursuant to 29 U.S.C. § 1132(g)(2), Cartage is ordered to pay the greater of double interest, or single interest plus liquidated damages, and all audit costs and attorneys' fees and costs reasonably incurred by the Pension Fund and the Health & Welfare Fund in connection with this action.

IV. The Funds' Motion for Summary Judgment against Transport on Counts III and IV, and Transport's Cross–Motion for Summary Judgment Against the Funds on Counts III and IV

A. Interpreting the Settlement Agreement

The question presented in Counts III and IV of the complaint is whether the Settlement Agreement released Transport from its guarantee obligation to the funds or, alternatively, from the obligation to the funds that it assumed from General Highway Express, Inc. ("GHE") when the two companies merged. The answer to this questions depends on whether GHE's original indebtedness in its present form is a "contribution obligation" within the meaning of the Settle-

ment Agreement or whether it is some other type of liability.

The court's first task is to determine which law will govern the interpretation of the Settlement Agreement. The preemptive language of ERISA should be broadly construed. *Miller v. Lay Trucking Co., Inc.,* 606 F.Supp. 1326, 1333 (N.D.Ind.1985). "State law that purports to govern the terms and conditions of pension plans generally is preempted by ERISA unless it relates to such plans 'only in the most ' remote and peripheral manner.'" *Id.* (*quoting Bucyrus–Erie Co. v. Dep't of Indus., Labor & Human Relations,* 599 F.2d 205, 209–10 (7th Cir. 1979), *cert. denied,* 444 U.S. 1031, 100 S.Ct. 701, 62 L.Ed.2d 667 (1980) (further citations omitted)).

A federal court in the Eastern District of New York has ruled that federal common-law governs the validity of settlement agreements resolving disputes under ERISA. *See Sheet Metal Workers Local 137 v. Vic Const.,* 825 F.Supp. 463 (E.D.N.Y.1993). To further the policies of ERISA, the court held that federal, not state, common-law would govern. It is not clear, however, that the same principles would apply to the interpretation as well as the validity of a Settlement Agreement under ERISA. Significantly, the Eastern District of New York declined to address the issue in a recent case because application of state or federal common-law would produce the same result. *See ILA Warehouse Employees Pension Fund v. Metro Storage Inc.,* 1993 WL 547427 at *3, 1993 U.S.Dist. LEXIS 18505 at *7 (E.D.N.Y.1993). This result is not surprising because when a statute such as ERISA or federal common-law do not speak to a particular issue, federal courts may look to state law. *See Fox Valley & Vic. Const. Workers' Pension Fund v. Brown,* 684 F.Supp. 185 (N.D.Ill.1988).

In this case, the settlement agreement does not contain a choice of law clause. Section 514 of ERISA suggests that the law

---

**4.** Cartage did not submit a Local Rule 12(n) statement admitting or denying the allegations in the funds' Local Rule 12(m) statement. Instead, Cartage submitted its own Local Rule 12(m) statement.

**5.** Cartage's figures for these three amounts are: $1,789,628.80 for non-union casuals payable to the Pension Fund, $158,329.00 for audit-revealed delinquencies payable to the Pension Fund, and $53,199.20 for audit-revealed delinquencies payable to the Health & Welfare Fund.

governing the interpretation of a settlement agreement related to a pension fund is preempted. *See* 29 U.S.C. § 1144. Since state law relating to ERISA is preempted, federal common-law developed under ERISA would normally be followed, *see id.*, however, since neither the statute, or federal common-law has spoken on this issue, the court looks to well established rules of contract construction.[6]

**B. The Funds' Motion for Summary Judgment Against Transport on Count III**

The Settlement Agreement states that it settles "all contribution obligations (including associated interest to date) of the companies listed ... through the last date audited by the funds for each company." Settlement Agreement at 4. The plain meaning of the phrase "contribution obligations" does not support the funds' position that Transport was *not* released from liability by the 1988 Settlement Agreement.

■ The starting point is the Settlement Agreement itself; if the language of the Settlement Agreement clearly and unambiguously determines an answer to the question at issue, then the inquiry is over. *See Air Line Stewards v. American Airlines, Inc.*, 763 F.2d 875, 877 (7th Cir.1985) (applying Illinois law), *cert. denied,* 474 U.S. 1059, 106 S.Ct. 802, 88 L.Ed.2d 778 (1986); *see also Craig v. Bossenbery,* 134 Mich.App. 543, 548, 351 N.W.2d 596, 599 (1984) (applying Michigan contract principles). Assuming, as the funds have argued, that the Settlement Agreement is unambiguous, then the plain meaning of the language, when viewed in a light most favorable to Transport, indicates that Transport's guarantee was not, as a matter of law, a "contribution obligation." *See Anderson,* 477 U.S. at 255, 106 S.Ct. at 2514.

■ Contrary to the funds' assertions, the plain meaning of the phrase "contribution obligations" supports Transport's argument that the Settlement Agreement released it from its guarantee obligation. The Oxford English Dictionary ("OED") defines "contribute" in the relevant sense in the following way: "3. To give or pay jointly with others; to furnish to a common fund or charge." Vol. 3 at 848 (2d Ed.1989). The OED defines "contribution" in the relevant sense in the following way: "1.a. The action of contributing or giving as one's part to a common fund." *Id.* The OED defines "obligation" in the relevant sense in the following way: "1. The action of binding oneself by oath, promise, or contract to do or forbear something; an agreement whereby one person is bound to another." Vol. 10 at 647 (2d Ed.1989). In this case, Transport's guarantee was a "contract to do or forebear something"—namely to "pay jointly ... to a common fund." *Id.;* Vol. 3 at 848. Transport's guarantee is within the plain meaning of the phrase "contribution obligations." Thus, interpreting the settlement by the plain meaning of the language undermines the funds' motion for summary judgment and supports Transport's motion for summary judgment.

That the debt originally owed by GHE was for delinquent contributions is not disputed by the funds. *See* complaint at ¶ 25. The funds argue that the debt originally owed by GHE took on a character apart from a "contribution obligation" when GHE underwent bankruptcy reorganization. However, the funds do not offer any factual or legal support for their proposition; nor do the funds attempt to explain the character of the debt after the reorganization. In short, the funds do not offer an answer to the question, "If the liability is not a contribution obligation, then what is it?" The funds simply assert that the debt was "replaced" after the bankruptcy reorganization. The funds state that "General's obligation to pay contributions to Central States [was replaced with a] distinct contractual undertaking established by the plan." According to the funds, since the original obligation was replaced, the guarantee was for a replacement debt and, therefore, is not a "contribution obligation." *See* Central States' Reply to Transport at 2. The funds do not, however, characterize the re-

---

6. Neither the funds nor Transport has addressed the choice of law issue and in their arguments both have assumed that the court will apply the principle that when the language of a contract is not ambiguous, the language of the contract will be given effect without regard to parol evidence.

placement debt as anything other than "not a contribution obligation." The court finds the argument that the debt changed character so as not to be a "contribution obligation" to be unsupported and unconvincing.

The Settlement Agreement does not require that the company that originally incurred the liability be the same company that is now obligated. The Settlement Agreement simply releases each of the enumerated companies, of which Transport is one, from "*all* contribution obligations." Settlement Agreement at 4 (emphasis added). The fact that Transport did not originally incur the liability is irrelevant. The liability is an obligation to contribute as those words are plainly used.

The funds have not offered any argument or evidence in support of the proposition that the guarantee was something other than an "obligation" as that word is plainly used, nor have they offered any argument or evidence in support of the proposition that the payments under the guarantee were not "contributions" as that word is plainly used. The funds have merely claimed that they did not intend what the plain language of the Settlement Agreement states.

The funds have not met the required burden to show that judgment is required as a matter of law in their favor. Because the evidence presented by the funds does not conclusively establish that the guarantee of GHE's indebtedness is *not* a "contribution obligation," the funds' motion for summary judgment on Count III of the complaint is denied.

### C. Transport's Motion for Summary Judgment Against the Funds on Count III

Transport argues that it should not be held liable under Count III of the complaint because the guarantee was extinguished as a matter of law when it merged with GHE. Transport has not argued choice of law issues or ERISA preemptive issues in its crossmotion for summary judgment. However, because the guarantee for a delinquent contribution is, as a matter of law, also considered a delinquent contribution, the court

does not need to delve into these issues. *Laborers' Pension Fund,* 999 F.2d at 1211.

Transport's guarantee to pay amounts owed by GHE are "contribution obligations." *See Id.* A guarantee for delinquent contributions is considered a delinquent contribution for purposes of ERISA. *Id.* In *Laborers' Pension Fund,* the Seventh Circuit recognized a pension fund's right to enforce a guarantee under section 515 of ERISA, the provision for "delinquent contributions." *Id.* Despite the fact that the pension funds in that case were collecting from a party other than the employer who was originally obligated to contribute to those funds, the Seventh Circuit characterized the payments as "delinquent contributions." *Id.*

In the instant case, the funds seek to enforce a guarantee of GHE's "delinquent contributions." Therefore, applying the rule in *Laborers' Pension Fund,* the guarantee must also be considered an obligation to pay "delinquent contributions" within the plain meaning of those words. Consequently the Settlement Agreement provision releasing Transport from "*all* contribution obligations" includes the guarantee obligation to pay *delinquent* contributions. Therefore, since Transport's guarantee for delinquent contributions is a "contribution obligation," it is released by the Settlement Agreement. Transport has demonstrated that the plain meaning of "contribution obligations" in the Settlement Agreement includes the guarantee and, therefore, Transport's Motion for Summary Judgment with regard to Count III of the funds' complaint is granted.

### D. The Funds' Motion for Summary Judgment Against Transport and Transport's Motion for Summary Judgment Against the Funds on the Employer Contribution Claim (Count IV)

In Count IV of the complaint, the funds seek to recover a debt that was: a) originally based on work history reported by GHE, b) replaced by a new debt after GHE went through Chapter 11 bankruptcy, and c) subsequently assumed by Transport when it merged with GHE. In Count IV, the funds present a successor liability argument in

which they state that Transport became an employer as defined by section 3(5) of ERISA (29 U.S.C. § 1002(5)) and, as a result, became liable for the delinquent contributions originally owed by GHE. Because issues of material fact exist as to this count, both motions for summary judgment are denied.

The funds argue that under both Michigan and Ohio law (the state laws that they argue are relevant with regard to this issue), the surviving party of a merger is responsible for all the liabilities of both parties to the merger. Central States' Memorandum in Response to Transport's Motion for Partial Summary Judgment ("Central States' Response") at 7 (*citing* Mich.Stat. § 450.1724; Ohio Rev.Stat.Ann. § 1701.82(A)(4)). However, Michigan and Ohio laws regarding corporate mergers are preempted in the instant case by section 514 of ERISA (29 U.S.C. § 1144). As has been noted, section 514 is to be broadly construed, and state law which relates to a pension fund is preempted by ERISA. Here, whether Transport assumed the obligations of GHE when the two companies merged is a question directly affecting a pension plan. Thus, any Michigan or Ohio law that may have been relevant is preempted.

■ Federal common-law associated with ERISA will be applied. The general rule that a successor is not liable for the liabilities of its predecessor is excepted in several circumstances. *Upholsterers' Int'l Union Pension Fund v. Artistic Furniture*, 920 F.2d 1323, 1329 (7th Cir.1990). "Successors have been held liable where (1) there is an expressed or an implied assumption of liability; (2) the transaction amounts to a consolidation, merger, or similar restructuring of the two corporations; (3) the purchasing corporation is a 'mere continuation' of the seller; and (4) the transfer of assets to the purchaser is for the fraudulent purpose of escaping liability for the seller's debts." *Id.* at 1325 (*citing Travis v. Harris Corp.*, 565 F.2d 443, 446 (7th Cir.1977)).

Transport satisfies the first two exceptions mentioned above. First, it knew of GHE's liability because it guaranteed the liability after GHE's Chapter 11 bankruptcy reorga-

nization. Transport expressly acknowledged the liability in the guarantee agreement. Second, the "transaction" between GHE and Transport did not merely "amount" to a consolidation or merger, it *was* a merger. Because Transport assumed GHE's liabilities as a matter of law when the two companies merged, the question now is whether the liability was discharged by the Settlement Agreement.

■ Issues of material fact exist with respect to whether the liability was discharged by the Settlement Agreement. Transport claims that the Settlement Agreement dated November 29, 1989 released it from any liability to pay the GHE debt assumed after the merger. Paragraph 1.B. of the Settlement Agreement releases:

(1) All contribution obligations (including interest, costs and associated penalties) of the companies listed below, and all credits that may be due from the Funds to such companies, *through the last date audited by the Funds* for each company:

a. Central Transport, Inc.

Settlement Agreement at 4 (emphasis added).

The liabilities released by sub-paragraph (1) of paragraph 1.B. are dependent on the "last date audited by the funds for each company." *Id.* The funds maintain that this date, with respect to Transport, is December 28, 1986. *See* Affidavit of Henry Radke ("Radke") at ¶ 3. Radke states that "[p]rior to 1991, Central States had not audited Transport for the period subsequent to December 27, 1986." *Id.* Although GHE and Transport had merged at the time the Settlement Agreement was signed, in December 1986 GHE and Transport existed as separate companies. Because the companies were separate, GHE, not Transport, was liable for the primary debt. An agreement that released Transport from "all contribution obligations" through December 1986 would not include the primary debt which was still held by GHE. Although Transport's guarantee obligation may have been extinguished by the Settlement Agreement, because the primary debt was still carried by GHE, it could

not have been resolved by sub-paragraph 1.B.(1).

Moreover, sub-paragraph 1.B.(2) of the Settlement Agreement does not release Transport from the liability it assumed when it merged with GHE. The Settlement Agreement releases Transport (among other companies) from

> (2) Contribution obligations (including associated interest to date) based on work history reported to the funds *by* and *for* the companies identified in Paragraph 1(B)(1) through July 30, 1988. . . .

Settlement Agreement at 4 (emphasis added). Whereas sub-paragraph 1.B.(1) releases "all contribution obligations," sub-paragraph 1.B.(2) qualifies the type of contribution obligations settled with the language: "based upon work history reported to the funds *by* and *for* [the companies listed]." *Id.* (emphasis added). GHE is not one of the companies listed in sub-paragraph 1.B.(1). *Id.* The debt assumed by Transport was not based upon work history reported to the funds by and for Transport. The debt assumed by Transport was based upon work history reported "by" GHE and "for" GHE prior to its Chapter 11 bankruptcy proceedings. Sub-paragraph 1.B.(2) of this portion of the Settlement Agreement cannot and does not release Transport from its liability for the GHE primary indebtedness.

The primary indebtedness incurred by GHE could not be released by sub-paragraph 1.B.(1) unless Transport was audited after it merged with GHE and before the parties executed the Settlement Agreement. Because there is a genuine issue of material fact with regard to the date on which the funds last audited Transport, summary judgment with respect to Count IV cannot be granted.

## CONCLUSION

The funds' motion for summary judgment against Cartage is granted with respect to Count I of the complaint. Cartage is ordered to pay damages in the amount of $1,944,626.60 to the Pension Fund plus the greater of double interest, or single interest plus liquidated damages, as well as all audit costs and attorneys' fees and costs reasonably incurred by the Pension Fund in connec-

tion with this action. Further, Cartage is ordered to pay damages in the amount of $52,504.20 to the Health & Welfare Fund, plus the greater of double interest, or single interest plus liquidated damages, as well as all audit costs and attorneys' fees and costs reasonably incurred by the Health & Welfare Fund in connection with this action.

The funds' Motion for Summary Judgment against Transport is granted with respect to Count I of the complaint. Transport is ordered to pay damages in the amount of $16,563.20 to the Pension Fund plus the greater of double interest, or single interest plus liquidated damages, as well as all audit costs and attorneys' fees and costs reasonably incurred by the Pension Fund in connection with this action. Transport is also ordered to pay damages in the amount of $13,065.60 to the Health & Welfare Fund plus the greater of double interest, or single interest plus liquidated damages, as well as all audit costs and attorneys' fees and costs reasonably incurred by the Health & Welfare Fund in connection with this action.

Transport's Cross Motion for Summary Judgment against the funds is granted with respect to Count III of the complaint. Transport's Cross Motion for Summary Judgment against the funds is denied with respect to Count IV of the complaint.

The funds' Motion for Summary Judgment is denied with respect to Counts III and IV of the complaint.

IT IS SO ORDERED.