**UPHOLSTERERS' INTERNATIONAL
UNION PENSION FUND,
Plaintiff–Appellant,**

v.

**ARTISTIC FURNITURE OF PONTIAC,
Defendant–Appellee.**

No. 89–3058.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 28, 1990.

Decided Dec. 11, 1990.

Karen I. Engelhardt, Jacobs, Burns, Sugarman & Orlove, Chicago, Ill., M. Eugene Wright, Wright & Wright, Danville, Ill., for plaintiff-appellant.

Edward A. Berman, Antonette C. Hue–Laitsch, Chicago, Ill., William L. Townsley, Sebat, Swanson, Banks, Garman & Townsley, Danville, Ill., for defendant-appellee.

Before POSNER and FLAUM, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.

FLAUM, Circuit Judge.

The trustees of the Upholsterer's International Union pension fund brought suit against Artistic Furniture of Pontiac in district court, alleging that the company was liable for its predecessor Pontiac Furniture's delinquent pension fund contributions. The district court granted summary judgment in favor of Artistic Furniture and denied the trustees' motion for summary judgment. We reverse in part and affirm in part.

### I.

From 1980 to 1985, Pontiac Furniture Inc. ("Pontiac") manufactured upholstered chairs and recliners at a plant in Pontiac, Illinois. Pontiac's employees were members of the Upholsterer's International Union. Under Pontiac's collective bargaining agreement with the union local, the company was obligated to make fixed contributions on behalf of its workers to the union's multiemployer pension fund ("Fund").

Pontiac began experiencing financial difficulties in the early 1980s. By 1984, the company's situation had deteriorated to the point where one of its creditors, James Talcott, who held a security interest in Pontiac's inventory, equipment, machinery, and furniture, exercised his right to review and veto its proposed payments to other more junior creditors. The Fund was

among those not paid by Pontiac from March, 1984 to August, 1985.

On August 28, 1985, Talcott foreclosed on his loan to Pontiac and sold the company's assets to Artistic Furniture ("Artistic"). Artistic's stock was owned by four individuals—Steve Connor, Joe Townsley, Ronald Roesink, and Earl Kessler—none of whom had any previous ownership interest in Pontiac. Artistic's officers and directors were different than those of Pontiac, with the exception of Larry Bork, Pontiac's Vice President of Finance, who stayed on to hold the same position with Artistic, and occupied a seat on Artistic's Board of Directors.

During the weeks before the foreclosure and subsequent sale, Artistic's management negotiated a new collective bargaining agreement with Pontiac's bargaining unit employees in anticipation of taking over Pontiac's operation. The agreement reached was similar to the agreement in effect between the union and Pontiac, and was designed to ensure a smooth transition between the two companies. Substantially all employees formerly employed by Pontiac were retained by Artistic and their seniority was honored. Artistic did not, however, represent to the union or to Talcott that it would assume liability for Pontiac's pension fund contribution shortfall.

On February 11, 1986, the Fund sued Pontiac in district court, alleging that Pontiac had failed to fulfill its obligation to contribute to the union's pension plan. Soon thereafter, the Fund amended its complaint to allege that Artistic, as the successor of Pontiac, was jointly and severally liable for the delinquent contributions. On August 3, 1987 the district court entered judgment against Pontiac in the amount of $89,609.95. The union, apparently, was not able to collect its judgment against Pontiac. The suit against Artistic continued, and two years later, following the close of discovery, both parties moved for summary judgment. The district court denied the Fund's motion and granted Artistic's, finding that there existed no commonality of ownership between Artistic and Pontiac that would mandate the imposition of liability and that Artistic was not otherwise liable for Pontiac's debt on a theory of successor liability.

The Fund's trustees appeal the district court's decision and request that we both reverse the district court and enter summary judgment in the Fund's favor. We now reverse the district court's grant of summary judgment to Artistic but affirm the court's denial of the Fund's motion.

## II.

We turn first to the district court's legal findings regarding the applicability of a theory of successor liability to the instant action. As this court has previously noted, the issue of successor liability is "dreadfully tangled, reflecting the difficulty of striking the right balance between the competing interests at stake." *E.E.O.C. v. Vucitech*, 842 F.2d 936, 944 (7th Cir.1988). We must endeavor to balance the well-articulated federal interest in ensuring that employers maintain properly funded pension plans and the social interest in facilitating the market in corporate and other productive assets. We appreciate the district court's efforts to strike this balance, but feel constrained to disagree with its ruling that labor law successorship principles cannot support the imposition of liability upon Artistic. However, we do not reverse the district court's denial of summary judgment to the Fund because material facts relevant to the imposition of liability remain in dispute.

## A.

The general common law rule, designed to maximize the fluidity of corporate assets, is that "a corporation that merely purchases for cash the assets of another corporation does not assume the seller corporation's liabilities." *Travis v. Harris Corp.*, 565 F.2d 443, 446 (7th Cir. 1977). Traditionally, this rule has been limited by four exceptions. Successors have been held liable where (1) there is an express or implied assumption of liability; (2) the transaction amounts to a consolidation, merger, or similar restructuring of the two corporations; (3) the purchasing corpora-

tion is a "mere continuation" of the seller; and (4) the transfer of assets to the purchaser is for the fraudulent purpose of escaping liability for the seller's debts. See *id.* at 446 (citations omitted).

However, "[t]he perimeters of the labor-law doctrine of successorship [ ] have not been so narrowly confined." *Golden State Bottling Co. v. NLRB,* 414 U.S. 168, 182 n. 5, 94 S.Ct. 414, 424 n. 5, 38 L.Ed.2d 388 (1973). Rather, the Supreme Court and this Circuit have imposed liability upon successors beyond the bounds of the common law rule in a number of different employment-related contexts in order to vindicate important federal statutory policies.

In *Golden State Bottling,* for example, the Supreme Court held that liability under the National Labor Relations Act could be imposed on a successor for a predecessor's unlawful discharge of an employee. The Court ruled that an employer who substantially assumes a predecessor's assets, continues the predecessor's operations without interruption or substantial change, and who has notice of a pending unfair labor practice charge at the time of acquisition can be required to remedy the unfair labor practice.[1] The Board's remedy in *Golden State* required reinstatement with back pay of the aggrieved employee. The Court affirmed the Board's remedial order against the successor in order to promote the free exercise of employees' rights under the NLRA and make whole the victimized employee. *Id.* at 184–85, 94 S.Ct. at 425–26. Speaking to the economic justifications underlying the common law presumption against successor liability, the Court found the imposition of liability to be of relatively minimal economic cost: because "the suc-

cessor must have notice before liability can be imposed, 'his potential liability for remedying unfair labor practices is a matter which can be reflected in the price he pays for the business....'" *Id.* at 185, 94 S.Ct. at 425, (quoting *Perma Vinyl Corp.,* 164 N.L.R.B. 968, 969 (1967)).

*Golden State* and its progenitor, *John Wiley & Sons Inc. v. Livingston,* 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964), have provided the foundation for a series of cases in which this court and others have concluded that the balance between the need to effectuate federal labor and employment discrimination policies and the need, reflected in the traditional common law rule, to facilitate the fluid transfer of corporate assets is best struck by the imposition of successor liability. In *Musikiwamba v. ESSI Inc.,* 760 F.2d 740 (7th Cir.1985), this court extended the labor law successorship doctrine to a § 1981 claim for employment discrimination. Three considerations motivated the court's decision: the existence of an "overriding federal policy against unfair [ ] employment practices," the recognition that "the victim of the illegal employment practice is helpless to protect his rights against an employer's change in the business," and the recognition that "the successor can provide relief at minimum cost." 760 F.2d at 746.

Similarly, in *Wheeler v. Snyder Buick, Inc.,* 794 F.2d 1228 (7th Cir.1986), we drew upon these justifications to impose liability upon a successor for a predecessor's Title VII violation. We reasserted our belief that "in the context of Congressional prohibition of discrimination in employment, judicial importation of the concept of successor liability is essential to avoid undercutting Congressional purpose by parsimony

---

**1.** The *Golden State* Court distinguished *NLRB v. Burns International Security Services Inc.,* 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972), a case cited by both *Artistic* and the district court for the proposition that the imposition of successor liability in this case would be inappropriate. In *Burns,* decided a year before *Golden State,* the Court ruled that successor employers could not be bound to the terms of a predecessor's collective bargaining agreement. The Court found that the NLRA's goal of facilitating free and unfettered collective bargaining would be significantly undermined if successor employers were held to the terms of their predeces-

sor's collective bargaining agreement. 406 U.S. at 281–84, 92 S.Ct. at 1579–80. The *Golden State* court noted, however, that *Burns* did not prevent the imposition of successor liability for an unfair labor practice violation. 414 U.S. at 184–85, 94 S.Ct. at 425–26. Rather, the imposition of unfair labor practice liability in *Golden State* was, and the imposition of delinquent contribution liability here would be, more in the nature of a discrete, one-time corrective than a constant damper on a successor's ability to bargain over the wide variety of issues typically at stake in the collective bargaining process.

in provision of effective remedies." 794 F.2d at 1237. Relevant to the imposition of liability[2] were the following factors: (1) whether the successor employer had prior notice of the claim against the predecessor; (2) whether the predecessor is able, or was able prior to the purchase, to provide the relief requested; and (3) whether there has been sufficient continuity in the business operations of the predecessor and successor. *Id.* at 1236. We found the first two factors to be critical because of our belief that it would be inequitable to hold a successor liable when it was unable to take the liability into account in negotiating the acquisition price or when the predecessor was capable of paying and merely attempted to externalize the liability onto another party. *Id.*

Finally, in *E.E.O.C. v. Vucitech,* 842 F.2d 936 (7th Cir.1988), we extended liability for Pregnancy Discrimination Act claims under Title VII to successor employers. In *Vucitech* we elaborated upon the economic rationale for successor liability:

> When the successor company knows about its predecessor's liability, knows the precise extent of that liability, and knows that the predecessor itself would not be able to pay a judgment obtained against it, the presumption should be in favor of successor liability.... This solution prevents the externalizing of the liability without disappointing the reasonable expectations of investors (and hence impeding the market for corporate assets). The successor, if he knows of his potential liability, will demand compensation in the form of a lower price for the assets, and in this way the burden of liability will be shifted back to the owners of those assets, where it belongs.

842 F.2d at 945.

■ These cases suggest several relevant principles. First, contrary to Artis-

tic's contention, the fact that the imposition of liability will have a significant fiscal impact on a successor is not prohibitive: in holding successors liable for backpay or employment discrimination damages in our previous cases, we have demonstrated a willingness to impose just such a burden. There is, of course, no relevant economic difference between the award of backpay or compensatory damages at issue in our previous successor liability cases and the delinquent contribution liability at issue here. Second, we have not confined the theory of successor liability to the NLRA context in which it was born, but rather have extended it to a variety of statutory contexts when the equities have so dictated. We have found the imposition of successor liability to be appropriate in those cases where the vindication of an important federal statutory policy has necessitated the creation of an exception to the common law rule, where the successor has had prior notice of the liability in question, and where there has existed sufficient evidence of continuity of operations between the predecessor and successor.

### B.

■ That being said, we do not see any reason why successor liability should not in principle apply to actions seeking recovery of delinquent multiemployer pension fund contributions. The congressional policies underlying ERISA and the Multiemployer Pension Plan Amendments Act of 1980[3] (MPPAA) are no less important, and no less compel the imposition of successor liability than do the policies animating the NLRA, Title VII, or Section 1981 in the cases previously discussed.[4]

■ Because multiemployer employer pension plans are "defined-contribution in,

---

**2.** Other Circuits have similarly extended successor liability to Title VII violations. *See, e.g., Trujillo v. Longhorn Mfg. Co. Inc.,* 694 F.2d 221 (10th Cir.1982); *EEOC v. MacMillan Bloedel Containers Inc.,* 503 F.2d 1086 (6th Cir.1974).

**3.** Pub.L. 96–364, 94 Stat. 1295, 29 U.S.C. § 1132 et seq.

**4.** The Fund argues that the failure to pay pension fund obligations constitutes an unfair labor practice, and hence, successor liability can be imposed directly under *Golden State.* To our knowledge, however, unfair labor practice charges have not been brought by the NLRB against Pontiac or Artistic. This court, of course, cannot make unfair labor practice find-

defined-benefit out," if some employers fail to make their required contributions, others must make up the difference in order to ensure that workers receive their designated benefits. *Central States, Southeast and Southwest Areas Pension Fund v. Gerber Truck Service Inc.*, 870 F.2d 1148, 1151 (7th Cir.1989) (en banc); *see also Robbins v. Lynch*, 836 F.2d 330, 333 (7th Cir. 1988); House Committee on Ways & Means, *Multiemployer Pension Plan Amendments Act of 1980*, H.R.Rep. No. 96–869, Part II, 96th Cong., 2d Sess. 15, reprinted in 1980 U.S.Code Cong. & Admin. News 2993, 3004 (hereinafter "House Report"). This is precisely the problem at issue here. Absent the imposition of successor liability, present and future employer participants in the union pension plan will bear the burden of Pontiac's failure to pay its share. An examination of relevant ERISA provisions suggests that this result would be contrary to congressional pension policy.

■ We note initially that the MPPAA gave statutory status to employers' contractual contribution duties under multiemployer plans, see 29 U.S.C. § 1145,[5] and then authorized certain parties to bring actions in federal court to enforce those obligations. See 29 U.S.C. § 1132. Congress sought to facilitate the collection of multiemployer plan contributions, since lag time between obligation and payment "imposes a variety of costs on plans. While contributions remain unpaid, the plan loses the benefit of the investment income that could have been earned if the past due amounts had been received and invested on time." Senate Committee on Labor & Human Resources, *The Multiemployer Pension Plan Amendments Act of 1980: Summary and Analysis of Consideration*, 96th Cong., 2d Sess., 43 (Comm. Print 1980) (hereinafter "Senate Report"). Moreover, Congress recognized that "[p]articipants and beneficiaries of plans as well as

employers who honor their obligation to contribute in a timely fashion bear the heavy cost of delinquencies in the form of lower benefits and higher contribution rates...." 126 Cong.Rec. 23039 (Rep. Thompson, House manager of the MPPAA); *see also* Senate Report at 43–44. To be sure, this provision does not speak directly to the problem of a delinquent contributor's financial collapse as is the situation here. Nevertheless, the federalization of multiemployer plan contribution obligations evinces a strong congressional desire to minimize contribution losses and the resulting burden such losses impose on other plan participants.

■ Also relevant to our inquiry are those MPPAA provisions imposing withdrawal liability on employers who cease participating in a multiemployer plan. In an effort to relieve the financial burden placed upon remaining contributors to a multiemployer fund when one or more of them withdraws from the plan, Congress enacted provisions which hold withdrawing employers liable, subject to certain adjustments, for their share of their plan's unfunded vested pension benefits. Though these liability provisions are not directly applicable here, as Pontiac's contribution liability is not technically a withdrawal liability, the congressional motives underlying their enactment are. Congress enacted the statutes imposing withdrawal liability in order to "relieve the funding burden on remaining employers" and to "avoid creating a severe disincentive to new employers entering the plan...." House Report, Part I, at 67, reprinted in 1980 U.S.Code Cong. & Admin.News 2918, 2935. *See also* House Report, Part II, at 15, reprinted in 1980 U.S.Code Cong. & Admin.News 2993, 3004. Congress also sought to prevent the creation of funding deficiencies which in the future might necessitate the infusion of Pension Benefit Guarantee Corporation (PBGC) insurance funds to cover shortfalls

ings in the first instance. This avenue of argument is thus closed.

**5.** Section 1145 provides that "[e]very employer who is obligated to make contributions to a multiemployer plan under the terms of the plan

or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement."

and hence would burden the large number of employers that support the PBGC through the premiums they pay. *See* House Report, Part II, at 15.

■ Absent the imposition of successor liability, the hardships that Congress sought to stave off in enacting the MPPAA may indeed result in cases where a predecessor employer is unable to fulfill its contribution obligation. As old collective bargaining agreements are renegotiated, and new ones formulated, present and future employers will have to increase their plan contributions in order to cover shortfalls created by the financial collapse of delinquent employers. In the face of this possible consequence, we believe that the congressional policies animating the MPPAA support the imposition of successor liability for unpaid multiemployer pension fund contributions when the other prerequisites to successor liability have been met. One other court of appeals has reached the same conclusion. *See Hawaii Carpenters Trust Funds v. Waiola Carpenter Shop Inc.*, 823 F.2d 289 (9th Cir.1987); *Northwest Administrator's Inc. v. Con Iverson Trucking Inc.*, 749 F.2d 1338, 1340 (9th Cir.1984).

■ As discussed above, the other predicates to the imposition of successor liability are as follows: to hold a successor liable we must find that there exist sufficient indicia of continuity between the two companies and that the successor firm had notice of its predecessor's liability. Continuity of operations is easily established here. Artistic employed substantially all of Pontiac's workforce and it appears, supervisory personnel as well. It used Pontiac's plant, machinery, and equipment and manufactured the same products. Work orders not completed by Pontiac prior to its termination were completed by Artistic. Artistic also agreed to honor warranty claims for goods sold by Pontiac. Finally, both Pontiac's Vice President of Finance, Larry Bork, and Vice President of Manufacturing, Richard Mahon, stayed on in the same positions under Artistic's management. These facts establish adequate continuity of operations for the purpose of imposing successor liability.

■ The question of whether Artistic had prior notice of Pontiac's liability is more difficult. Notice can be proven not only by pointing to facts that conclusively demonstrate actual knowledge, but also by presenting evidence that allows the fact finder to imply knowledge from the circumstances. See *Golden State*, 414 U.S. at 173, 94 S.Ct. at 419; *NLRB v. South Harlan Coal Inc.*, 844 F.2d 380, 385 (6th Cir. 1988). In *Golden State*, for example, the Supreme Court affirmed the finding of the Board and the Court of Appeals that the presence at negotiations between the two companies of an individual who was the predecessor's manager and became the successor's general manager supported the inference that the successor had knowledge of the predecessor's unfair labor practice. And in *South Harlan Coal*, the Sixth Circuit took note of the proximity of the predecessor's and successor's business operations, the extensive news coverage of the union activity at issue, and the successor's lack of credibility in affirming the Board's decision inferring knowledge of an unfair labor practice.

The only evidence in the record that speaks to the question of notice is Larry Bork's deposition testimony. Bork, currently Artistic's Vice President of Finance, indicated that during his tenure at Pontiac, he had knowledge of the pension contribution liability. However, it is unclear from Bork's testimony whether as a Pontiac employee he informed Artistic of the liability before the sale took place. The record does show that Bork had at least one meeting and a number of phone conversations with Artistic officials before the acquisition took place, and that "questions about the company" were discussed, but the substance of those communications is unknown. Bork also discussed with Artistic's stockholders his own future employment arrangement and other staff hiring matters.

These facts do not conclusively prove actual knowledge, but they might support a reasonable inference that members of Artistic's control group had knowledge of Pontiac's contribution liability. Whether

the facts actually do or do not support such an inference is a question best resolved in the district court after the presentation and evaluation of further evidence. Given the current state of the record, the presence of this factual dispute renders summary judgment at this juncture for either party inappropriate.

We therefore reverse the district court's decision to grant summary judgment to Artistic, affirm the court's denial of summary judgment to the Fund, and remand for further proceedings consistent with this opinion.