**William EINHORN, Administrator of the Teamsters Pension Trust Fund of Philadelphia and Vicinity and the Teamsters Health and Welfare Trust Fund of Philadelphia and Vicinity, Plaintiff,**

v.

**M.L. RUBERTON CONSTRUCTION COMPANY, Defendant/Third Party Plaintiff,**

v.

**Ronald Tobia, Esq.; Tobia & Sorger Esquires, LLC; and David DeClement, Esq., Third Party Defendants.**

**Civil Action No. 06–2511.**

United States District Court, D. New Jersey.

Oct. 26, 2009.

Stevens & Lee by Frank C. Sabatino, Esq., Jo Bennett, Esq., John C. Kilgannon, Esq., Philadelphia, PA, for Plaintiff.

Cohen, Seglias, Pallas, Greenhall, & Furman, PC by Melissa C. Angeline, Esq., Jonathan Landesman, Esq., Haddon Heights, NJ, for Defendant/Third Party Plaintiff.

Carroll, McNulty, & Kull, LLC by David M. Kupfer, Esq., Baskin Ridge, NJ, for

Third Party Defendants Tobia and Tobia & Sorger.

Harry R. Blackburn & Associates P.C. by John Edward Shields, Jr., Esq., Medford, NJ, for Third Party Defendant De-Clement.

## OPINION

IRENAS, Senior District Judge:

Presently before the Court are four motions for summary judgment. This Opinion addresses only the principal action: Plaintiff Einhorn's suit against Defendant M.L. Ruberton Construction Company ("Ruberton"), in which cross motions for summary judgment are pending. A separate opinion will, if necessary, address the third party action, involving Ruberton's legal malpractice claims against Third Party Defendants Ronald Tobia, Esq.; Tobia & Sorger Esquires, LLC (collectively the "Tobia Defendants"); and David DeClement, Esq.

The cross motions for summary judgment in the principal action raise one central issue: in this ERISA[1] action,[2] under a theory of successor liability, may Ruberton be held liable for delinquent contributions to the Funds[3] administered by Plaintiff Einhorn? Because the Court holds that Ruberton may not be held liable as a matter of law, Ruberton's Motion for Summary Judgment will be granted, and Einhorn's Motion for Summary Judgment will be denied.

## I.

*Background*

This suit is the third of three related cases that have been brought before this Court over the past four years. In the first suit, *Teamster's Local Union No. 676 v. Statewide Hi–Way Safety, Inc.,* (05–4652)(JEI) ("the Injunction Suit"), Local 676, who had collective bargaining agreements with Statewide (see discussion *infra*), sought to enjoin Statewide from selling its assets to Ruberton. As will be discussed in further detail later, the Injunction Suit was quickly settled, and Statewide sold its assets to Ruberton shortly thereafter. It is that asset sale which, Einhorn presently alleges, created a predecessor-successor relationship between Statewide and Ruberton.

In the second suit, *Einhorn v. Statewide, George R. Smith Jr., and Ruberton,* (05–5774)(JEI)("the Delinquency Suit"), Einhorn sought to recover allegedly delinquent payments to the Funds, which Statewide was obligated to make pursuant to its collective bargaining agreements with Local 676. While Einhorn alleged that the delinquencies arose prior to the asset sale, he also alleged that Ruberton was liable for the delinquencies as Statewide's successor. Like the previous Injunction Suit, the Delinquency Suit was also settled. In the agreement settling the Delinquency Suit, Statewide agreed to pay the alleged delinquencies in exchange for Einhorn waiving a portion of the liquidated damages to which the Funds would otherwise be entitled, if Einhorn prevailed in the lawsuit.[4] Statewide never paid the full

---

1. Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001–1461; and the Multiemployer Pension Plan Amendments Act of 1980, 29 U.S.C. §§ 1381–1461.

2. The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

3. As the caption indicates, the "Funds" are the Teamsters' Pension Trust Fund of Phila-

delphia and Vicinity, an ERISA "employee pension benefit plan," 29 U.S.C. § 1002(2)(A); and the Teamsters' Health & Welfare Fund of Philadelphia and Vicinity, an ERISA "employee welfare benefit plan," 29 U.S.C. § 1002(1). Both funds are "multiemployer plans." 29 U.S.C. § 1002(37).

4. Einhorn also agreed to dismiss without prejudice the claim against Ruberton.

amount due under the Settlement Agreement, leading to the instant suit, where Einhorn has sued only Ruberton, attempting to recover what Statewide failed to pay ("the Successor Suit").[5]

*Statewide and Ruberton Before the Asset Sale*

Statewide was a heavy highway construction company with facilities in Folsom, New Jersey. Specifically, Statewide's business consisted of highway paving, highway drainage and installation of guide rails, signage and fencing. (Pl's State. of Undisp. Facts ¶ 31–32; Def's State. of Undisp. Facts ¶ 17)

Statewide had three collective bargaining agreements (CBAs) relevant to the instant case: one with Teamsters Local Union No. 331, and two with Local 676. Statewide was required to make contributions to the Funds under all three agreements.

Statewide experienced financial trouble throughout 2003, 2004, and 2005. (Pl's State. of Undisp. Facts ¶ 36; Def's State. of Undisp. Facts ¶ 25–26)[6] Indeed, in 2005, Statewide's financial situation went from bad to worse when the State of New Jersey began investigating Statewide for fraud in connection with state highway projects, and Statewide faced the prospect of being debarred from public contract work in New Jersey. (Def's State. of Undisp. Facts ¶ 29)[7] Around the same time, the Funds began an audit of Statewide's payroll records, which revealed delinquencies owed under all three CBAs. (Pl's State. of Undisp. Facts ¶ 47; Def's Response ¶ 47) According to Einhorn, those delinquencies totaled $495,638.17, with additional liquidated damages of $94,606.02. (Pl's State. of Undisp. Facts ¶ 49; Def's Response ¶ 49)

Then Ruberton entered the picture. Ruberton, with its offices in Hammonton, New Jersey, performed general commercial construction, mainly in Southern New Jersey. (Pl's State. of Undisp. Facts ¶¶ 56–58; Def's Response ¶¶ 56–58; Def's State. of Undisp. Facts ¶ 10) Prior to 2005 and the negotiations leading up to the asset purchase, Ruberton had no CBAs with any union. (Pl's State. of Undisp. Facts ¶ 72)

In 2005, Ruberton's business, while not suffering to the same extent as Statewide, was slowing. (Def's State. of Undisp. Facts ¶ 30; Pl's State. of Undisp. Facts ¶ 60). Thus, Ruberton began looking for the right business opportunity. (Def. State. of Undisp. Facts ¶ 30; Pl's Response ¶ 30) Having heard rumors of Statewide's troubles, in July, 2005, Ruberton's President, Andrew Berenato, approached Statewide "to see if there was any opportunity there for us." (2008 A. Berenato Dep. at 146)

Not long after the first contact between Statewide and Ruberton, Local 676 apparently learned of the potential transaction between the two companies. Fearing that Ruberton (a non-union employer) would

---

**5.** By October, 2008, Statewide had at least 15 judgments entered against it and less than $250 in its bank accounts. (Pl's State. of Undisp. Facts ¶ 38)

**6.** Statewide's financial trouble included a default judgment against it, which this Court entered in Local 676's suit to recover unpaid union dues and contributions to vacation and annuity funds. *See Teamsters Local 676 and Employers' Annuity Fund et al. v. Statewide Hi–Way Safety, Inc.*, No. 04–cv–6157 (JEI), Amended Judgment of July 15, 2005. The funds at issue in that case are not the same Funds at issue in this case.

**7.** State and federal authorities ultimately brought criminal fraud charges against Statewide's President, George Smith, Jr. (Pl's State. of Undisp. Facts ¶ 40–41) He pleaded guilty to mail fraud in the United States District Court for the Eastern District of Pennsylvania. (Id.)

not agree to become a party to Statewide's CBA, Local 676 filed the Injunction Suit in late September, 2005.[8] Just two days after this Court issued a temporary restraining order enjoining the consummation of the Statewide—Ruberton transaction, negotiations among Local 676, Statewide, and Ruberton began in an effort to settle the Injunction Suit and go forward with the transaction.

*Negotiations Resulting in the Settlement of the Injunction Suit*

On September 29, 2005, Local 676 (through its President[9], Howard Wells), Statewide (through it's President, George Smith, Jr.), Ruberton (through its President, Andrew Berenato), and the Funds (through Einhorn) attended a meeting to discuss the issues raised by the Injunction Suit.[10] During that meeting, Einhorn and Smith, Jr. discussed Statewide's delinquent contributions to the Funds. (2008 A. Berenato Dep. at 114–15; 2008 Einhorn Dep. at 41–42, 47–48; Smith, Jr. Dep. at 112; Sahli Dep. at 56–57) Andrew Berenato testified that he first became aware of Statewide's defaulted obligations at this meeting. (2008 A. Berenato Dep. at 162) Indeed, Berenato testified that he specifically heard Einhorn tell Smith, Jr. that Statewide owed the Funds approximately $500,000. (Id. at 114–15)

The nature of the potential Statewide—Ruberton transaction was also discussed. Ronald Sahli, Esq., counsel for Statewide, explained that Statewide intended to only " 'sell[ ] iron' " (i.e., heavy highway construction equipment) to Ruberton. (Sahli Dep. at 63; see also 2008 Einhorn Dep. at 40, 43; 2006 Wells Dep. at 16–18; Tobia Dep. at 164) Sahli explained that Statewide intended to "finish out its own jobs" using leased equipment. (Sahli Dep. at 63–64; see also 2008 Einhorn Dep. at 40, 43; 2006 Wells Dep. at 17)

On October 6, 2005, a second, longer meeting was held among the same people who attended the prior meeting.[11] According to Andrew Berenato, Ruberton's main objective at the meeting was to ensure that Ruberton would not be liable for Statewide's debts to the Funds. He testified, "the main thing on that meeting for M.L. Ruberton was that, since we knew there was a problem with Statewide and the Funds, that we certainly would not be held the successor to them and liable for that debt." (2008 A. Berenato Dep. at 102; see also 2008 A. Berenato Dep. at 213)

The Funds' objective at the meeting was mainly to protect their interest in delinquent and future contributions. The Funds were not a party to the Injunction Suit, therefore Einhorn's participation in the meeting, to the extent the meeting was geared toward settling the Injunction Suit, was limited. (2008 Einhorn Dep. at 80, 91) Einhorn explained the Funds' position at that meeting:

8.  Local 676 asserted that its CBA with Statewide required any successor or assignee of Statewide to become party to the CBA. It sought a temporary restraining order and injunction preventing the sale, lease, transfer or takeover of Statewide until Local 676's previously filed grievance concerning the transaction was resolved or until Ruberton agreed to be bound by Statewide's CBA.

9.  Einhorn identifies Wells as Local 676's "Principal Officer." (Pl's State. of Undisp. Facts ¶ 10) The difference in titles does not appear to be material.

10. Various attorneys, including counsel for Statewide, Local 676, and Ruberton, also attended the meeting. (Def's State. of Undisp. Facts ¶ 45; Pl's Response ¶ 45)

11. Additionally, Rick Berenato, Ruberton's Vice President (and Andrew Berenato's brother) attended the October 6th meeting. While Smith, Jr., and Statewide's counsel Ronald Sahli, participated by telephone, they were not physically present at the meeting. (Pl's State. of Undisp. Facts ¶ 13; Def's Response ¶ 13)

I'm not really in the driver's seat here, I'm not a party to [the Injunction Suit], but if the [Statewide–Ruberton] sale goes through and there are going to be funds released, we want a portion of those funds. We want the audit [of Statewide] completed. We want continuation of, if [Statewide is] going to continue operations, we don't want any further delinquencies to occur.

(Id. at 80)

Local 676's objective was to ensure that if the asset sale proceeded, Ruberton would hire the ten Local 676 workers who worked for Statewide at the time, rather than hiring non-union workers. (Tobia Dep. at 156–57, 173, 178, 200)

Two separate agreements were drafted and signed at the October 6th meeting: one between Local 676 and Statewide; and one between Local 676 and Ruberton. In the Local 676—Statewide Agreement, Local 676 agreed to dismiss the Injunction Suit without prejudice, and Statewide, among other things, agreed to cooperate fully with the Funds' payroll audit and to timely remit all future Funds contributions.[12] (Def's Ex. 13)

The Local 676—Ruberton Agreement provides, in relevant part,

M.L. Ruberton agrees that it will hire, subject to its work needs, the existing workforce of [Statewide] that perform work covered by Statewide's collective Bargaining agreement with Local 676, IBT. . . . Ruberton agrees that such employment shall be governed by the existing Local 676, IBT—Statewide CBA on an interim basis until a new CBA is negotiated . . . . in accordance with the above, the parties agree that a new CBA will be negotiated by Local 676, IBT and Ruberton to replace the existing agreement within a reasonable period of time but no later than the expiration of the existing agreement, and such new CBA will cover all employees of Ruberton whether hired from Statewide or currently employed by Ruberton.

(Def's Ex. 14)

Both agreements were drafted from scratch and signed at the meeting, mainly because there was a very short window of time in which to get the injunction lifted and proceed with the asset sale.[13] (Tobia Dep. at 192, 196) Neither agreement expressly addressed the issue of Ruberton's potential successor liability to the Funds. As Einhorn is quick to note, neither agreement waived any successorship claim against Ruberton. However, the Funds were not a party to either agreement, and as Ruberton is quick to note, neither agreement states that Ruberton will guarantee or become liable for Statewide's debts to the Funds.

*The Asset Sale*

Four days later, on October 10, 2005, Statewide[14] sold its assets to Ruberton for

12. The agreement also states that Statewide's "first lienholder, Investment Systems, Inc." will pay the Funds $60,000, which apparently was meant to satisfy a portion of Statewide's delinquencies. (Pl's State. of Undisp. Facts ¶ 16; Def's Response ¶ 16) However, no one from Investment Systems signed the agreement. In any event, the record indicates that Investment Systems did pay the Funds.

13. In addition to its other problems, Statewide apparently had an issue with the New Jersey Division of Taxation which could have undermined the asset sale. Tobia testified, "if we didn't get [the asset sale] closed like with-

in the week . . . [the Division of Taxation was] threatening Draconian moves that would moot everything, and we would be just out of luck with this transaction. This would not happen because they would swoop in and take everything, basically." (Tobia Dep. at 192)

14. The Asset Purchase Agreement is actually between Ruberton on the one hand, and Statewide and GPG Partnership on the other. (Def's Ex. 15) GPG Partnership and Statewide were essentially owned by the same three people: George Smith, Jr., and his two siblings, Glen Smith and Patricia (Smith) Zel-

$1.6 million in cash. The agreement provided that "[Ruberton] will acquire, all of the assets related to [Statewide's] Business." (Def's Ex. 15) Those assets included, among other things, all "office equipment, furnishings and fixtures, machinery, vehicles and construction equipment"[15]; "access to all sales and business records and information;" "access to all [of Statewide's] telephone and facsimilie numbers;" "rights under all leases for Equipment;" "all permits, licenses, franchises, [etc.];" and "all of Statewide's inventory." (Id.) The section entitled "Excluded Assets" is "[i]ntentionally left blank" (Id.), however, Smith, Jr. testified that Ruberton did not purchase Statewide's accounts receivable, which he estimated amounted to more than $5 million. (Smith, Jr. Dep. at 45–46, 136)

The Asset Purchase Agreement makes no mention of Statewide's liabilities generally[16], nor does it reference Statewide's debts specifically to the Funds.

Simultaneously with the execution of the Asset Purchase Agreement, related entities of Statewide and Ruberton—Smith Properties, LLC, and RAL Real Estate, LLC, respectively—entered into a Lease Purchase Agreement for Statewide's facility in Folsom, New Jersey. (Exhibit to George Smith, Jr. Dep.)[17] Through the agreement, Smith Properties granted RAL Real Estate a leasehold interest with an option to purchase the property for one million dollars. The agreement states that the property's purchase price "is a part of the total purchase price of 2.6 Million Dollars ($2,600,000.00) for certain assets and real property." (Id.)

*Statewide and Ruberton After the Asset Sale*

Soon after the Lease Purchase Agreement was signed, Ruberton moved into the Folsom complex.[18] (2008 A. Berenato Dep. at 8–9)[19] However, George Smith Jr., testified that Statewide continued to operate out of the Folsom facility as well, although it had only two to four "direct" employees. (Smith. Jr. Dep. at 29–30; 33)

Approximately two months after the asset sale, Ruberton sold at auction many of the assets it purchased from Statewide. (Def's Ex. 16)[20] Rick Berenato testified

---

lers. (Smith, Jr. Dep. at 22–24) GPG owned dump trucks and leased them to Statewide. (Id. at 22)

15. Examples of machinery and equipment sold include machinery from the weld shop and the mechanic shop (e.g., air compressors, jackhammers, ventilation systems, etc.), as well as office equipment (e.g., telephones, computers, file cabinets, etc.). (Def's Ex. 15)

16. Ruberton did agree to pay one $160,000 outstanding balance which Statewide owed on some heavy equipment. The Asset Purchase Agreement specifically addressed this particular liability in section 1.5 of the agreement. (Def's Ex. 15)

17. George Smith, Jr., his father, and his siblings signed the agreement on behalf of Smith Properties, LLC. (Exhibit to George Smith, Jr. Dep.) Andrew Berenato signed the agreement on behalf of RAL Real Estate, LLC, the Berenato's real estate holding company. (Id.; 2008 A. Berenato Dep. at 31) "RAL" is the combined initials of siblings Rick Berenato,

Andrew Berenato, and Liz (Berenato) Pitale, who are RAL Real Estate's owners. (2008 A. Berenato Dep. at 31–32) Andrew Berenato testified that RAL Real Estate assigned the Lease Purchase Agreement to another of the Berenato's related companies, Brianna, LLC, which is also owned by the three Berenato siblings. (Id. at 32–33)

18. Ruberton repeatedly emphasizes in its briefs that it "extensively renovated" Statewide's facility in order to suit its needs. However, the Court has found no record support for this assertion.

19. In August, 2007, Brianna, LLC, exercised the option to purchase the property, buying the Folsom facility for $1 million. (2008 A. Berenato Dep. at 35) Ruberton rents the facility from Brianna. (Id.)

20. At the same auction, Ruberton also sold other equipment that it owned prior to the asset sale. (Pl's State. of Undisp. Facts at ¶ 82; Def's Response at ¶ 82)

that Ruberton "sold all the equipment that was associated with [Statewide's] paving division and anything else that we deemed not necessary, excess equipment." (R. Berenato Dep. at 11) Rick Berenato estimated that Ruberton derived approximately $616,235 from the sale of assets that formerly belonged to Statewide. (Pl's State. of Undisp. Facts ¶ 82; Def's Response at ¶ 82)

As already noted, Statewide continued in business after the asset sale. George Smith, Jr. estimated that Statewide was working on 30 projects as of January, 2006, using subcontractors who "have the type of equipment [Statewide] need[ed] to do the job." (Smith, Jr. Dep. at 34) Ruberton was one of the subcontractors Statewide used on "some" of the projects. (Id. at 36) Smith, Jr. explained,

> [i]f somebody calls me to go do something on a job, I'll rent [Ruberton's] man [sic] and equipment for the day to go do it. There's no agreement, no written anything, I just go do it on a day-to-day basis and get done what has to be done. If I know they can do it or if not I have to go to somebody else.
>
> . . .
>
> First I call [Ruberton] and ask them if they have anybody that they'll rent . . . and if they say no, then I got to go out into the marketplace to find somebody to do the work.

(Id. at 38) Indeed, the record indicates that in 2005, Ruberton billed Statewide more than $400,000 for employees and equipment that Statewide rented. (Pitale Dep. at 61, 64) On the other hand, Smith further testified that there were "at least three or four" times since the asset sale that Ruberton had declined to rent its employees and equipment to Statewide. (Id. at 39)

In the three months after the asset sale, Ruberton hired many former Statewide employees.[21] (Pl's State. of Undisp. Facts ¶¶ 66–70; Def's Responses ¶¶ 66–70) Of particular note, Ruberton hired some of Statewide foremen and supervisors, including Glen Smith, Statewide's Vice President and 33% shareholder. (Pl's State. of Undisp. Facts ¶ 74; Def's Response ¶ 74) Specifically, Glen Smith's title at Ruberton was "operating engineer" and his duties included operating equipment. (2008 A. Berenato Dep. at 43) There is no evidence in the record establishing that Smith had any ownership interest in Ruberton, nor does the evidence show that he was a vice-president at Ruberton, as he had been at Statewide.

Ruberton also took over work on many Statewide projects.[22] Rick Berenato testified how this happened:

> [We (Ruberton) said to the customers,] you had this with Statewide . . . we're willing to do it in lieu of them at the same price, and as long as they okayed it, you know, we would do it. . . . [B]asically we just explained to [the customers] that Statewide was primarily, in essence, out of business and that we had bought all of their equipment and hired some of their key personnel and that we would be willing to fulfill the obligations of the contracts, and in a lot of cases we had new contracts made out to Ruberton. Some of the smaller jobs were just done with purchase orders.

---

21. Ruberton admits in its own moving brief that it hired, at one time or another, more than half of Statewide's employees. (Def's Moving Brief at 12)

22. It appears that Statewide began working on some projects before the asset sale, which were then finished by Ruberton after the asset sale. (R. Berenato Dep. at 38) On many other projects, Statewide had been awarded the contract before the asset sale but never commenced work. (R. Berenato Dep. at 31–33; 37)

(R. Berenato Dep. at 32–34) In 2005, Ruberton worked on 25 projects that originated with Statewide. (Pl's State. of Undisp. Facts at ¶ 78; Def's Response at ¶ 78)

## II.

"Under Rule 56(c), summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)).

In deciding a motion for summary judgment, the Court must construe the facts and inferences in a light most favorable to the nonmoving party. *Pollock v. Am. Tel. & Tel. Long Lines,* 794 F.2d 860, 864 (3d Cir.1986). "'With respect to an issue on which the nonmoving party bears the burden of proof, the burden on the moving party may be discharged by 'showing'— that is, pointing out to the district court— that there is an absence of evidence to support the nonmoving party's case.'" *Conoshenti v. Pub. Serv. Elec. & Gas,* 364 F.3d 135, 145–46 (3d Cir.2004) (quoting *Celotex,* 477 U.S. at 325, 106 S.Ct. 2548). The role of the Court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The summary judgment standard is not affected when the parties file cross-motions for summary judgment. *See Appel-* *mans v. City of Phila.,* 826 F.2d 214, 216 (3d Cir.1987). Such motions "'are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist.'" *Transportes Ferreos de Venez. II CA v. NKK Corp.,* 239 F.3d 555, 560 (3d Cir.2001) (quoting *Rains v. Cascade Indus., Inc.,* 402 F.2d 241, 245 (3d Cir.1968)). If after review of cross-motions for summary judgment, the record reveals no genuine issues of material fact, then judgment will be entered in favor of the deserving party in light of the law and undisputed facts. *Iberia Foods Corp. v. Romeo,* 150 F.3d 298, 302 (3d Cir.1998).

## III.

As already stated, the issue is whether Ruberton may be held liable for Statewide's debts to the Funds. The Third Circuit has not addressed the factual scenario presented here, where a corporate entity buys the assets of another corporate entity.[23] The parties both assume that *Upholsterers' International Union Pension Fund v. Artistic Furniture of Pontiac,* 920 F.2d 1323 (7th Cir.1990), provides the applicable rule of law in this case. *Artistic Furniture* held that a successor entity may be liable for the predecessor's debt arising from delinquent ERISA fund contributions "where [1] the successor has had prior notice of the liability in question, and [2] where there has existed sufficient evidence of continuity of operations between the predecessor and successor." 920 F.2d at 1327.[24] As the Seventh Circuit

---

**23.** As discussed further *infra,* the Third Circuit has imposed successor liability in the context of a merger. *See Teamsters Pension Trust Fund of Philadelphia & Vicinity, William J. Einhorn v. Littlejohn,* 155 F.3d 206, 209 (3d Cir.1998).

**24.** *See also Hawaii Carpenters Trust Funds v. Waiola Carpenter Shop, Inc., et al.,* 823 F.2d 289, 293–95 (9th Cir.1987) (cited in *Artistic Furniture*) (imposing successor liability for delinquent fund contributions upon a finding of "substantial continuity between the enterprises," and explaining that the inquiry "is

explained, the two-pronged test expanded liability for delinquent fund contributions, departing from "[t]he general common law rule ... that a corporation that merely purchases for cash the assets of another corporation does not assume the seller corporation's liabilities." *Artistic Furniture*, 920 F.2d at 1326.

For the reasons set forth herein, the Court concludes that the common law rule, rather than *Artistic Furniture*'s expanded liability standard, must be applied in this case.

### A.

The Seventh Circuit derived its successor liability standard from *Golden State Bottling Co., Inc. v. NLRB*, 414 U.S. 168, 94 S.Ct. 414, 38 L.Ed.2d 388 (1973), concluding that the same rationale supporting expanded successor liability in *Golden State* supported expanded liability for delinquent ERISA fund contributions. *See Artistic Furniture*, 920 F.2d at 1326–27. But *Golden State* is distinguishable from both *Artistic Furniture* and the instant case.

*Golden State* held that an asset purchaser could be held liable as a successor for the unfair labor practice of a predecessor. 414 U.S. at 171, 94 S.Ct. 414. At issue in that case was a National Labor Relations Board ("NLRB") order against the predecessor company directing the company to reinstate a delivery truck driver (a Teamsters member) and pay him backpay with interest. *Id.* at 170, 94 S.Ct. 414.[25] The Supreme Court affirmed the Ninth Circuit's holding that the NLRB could enforce the order against the successor company. *Golden State*, 414 U.S. at 171, 94 S.Ct. 414. The case was a suit under the National Labor Relations Act,[26] not ERISA.

The Supreme Court stated, "when a new employer ... has acquired substantial assets of its predecessor, and continued, without interruption or substantial change, the predecessor's business operations" and does so "with knowledge of the outstanding Board order," the successor employer may be held liable "for remedying the unfair labor practices" of the predecessor employer. *Golden State*, 414 U.S. at 184, 171, 185, 94 S.Ct. 414 (internal quotation and citation omitted). In so holding, the Supreme Court affirmed the NLRB's reasons justifying the imposition of liability, as stated in *Perma Vinyl Corp.*, 164 N.L.R.B. 968 (1967):

> 'In imposing this responsibility upon a bona fide purchaser, we are not unmindful of the fact that he was not a party to the unfair labor practices and continues to operate the business without any connection with his predecessor. However, *in balancing the equities involved* there are other significant factors which must

more functional than formal.") (internal citation and quotation omitted); *see generally Stotter Division of Graduate Plastics Co., Inc.*, 991 F.2d 997, 1001–02 (2d Cir.1993) (affirming district court's confirmation of arbitration award imposing successor liability for delinquent fund contributions; citing with approval *Artistic Furniture* and *Hawaii Carpenters*); *cf. Massachusetts Carpenters Central Collection Agency v. Belmont Concrete Corp., et al.*, 139 F.3d 304, 308 (1st Cir.1998) (equating the imposition of successor liability with the imposition of liability based on an alter ego theory, and imposing liability based on, among other things, a finding of continuity of ownership between the two companies at issue), *compare Artistic Furniture*, 920 F.2d at 1325 (reversing district court's denial of successor liability upon a finding that the two companies lacked commonality of ownership).

25. The Board found that the predecessor had engaged in an unfair labor practice by firing the union member in retaliation for his lawful opposition to his employer's proposed $3 a week raise. *Golden State Bottling Co.*, 147 N.L.R.B. 410 (1964).

26. *See* 29 U.S.C. § 158(a)(3) and (1).

be taken into account. Thus, [i]t is the employing industry that is sought to be regulated and brought within the corrective and remedial provisions of the Act in the interest of industrial peace. When a new employer is substituted in the employing industry there has been no real change in the employing industry insofar as the victims of past unfair labor practices are concerned, or the need for remedying those unfair labor practices. Appropriate steps must still be taken if the effects of the unfair labor practices are to be erased and all employees reassured of their statutory rights. And it is the successor who has taken over control of the business who is generally in the best position to remedy such unfair labor practices most effectively. The imposition of this responsibility upon even the bona fide purchaser does not work an unfair hardship upon him. When he substituted himself in place of the perpetrator of the unfair labor practices, he became the beneficiary of the unremedied unfair labor practices. Also, his potential liability for remedying the unfair labor practices is a matter which can be reflected in the price he pays for the business, or he may secure an indemnity clause in the sales contract which will indemnify him for liability arising from the seller's unfair labor practices.'

*Golden State,* 414 U.S. at 171 n. 2, 94 S.Ct. 414 (quoting *Perma Vinyl;* emphasis added). Thus, the Court explained, "the *Perma Vinyl* line of cases has involved striking a balance between conflicting legitimate interests of the bona fide successor, the public, and the affected employee .... [with] *an emphasis upon pro-*

*tection for the victimized employee." Id.* at 181, 94 S.Ct. 414 (emphasis added). The Court continued, "'the rightful prerogative of owners independently to rearrange their business and even eliminate themselves as employers [must] be balanced by some protection to the employees from a sudden change in the employment relationship.'" *Id.* at 182, 94 S.Ct. 414 (quoting *John Wiley & Sons, Inc. v. Livingston,* 376 U.S. 543, 549, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964) [27]).

■ In suits for delinquent ERISA fund contributions, the balance of equities is markedly different: while the "prerogative of owners independently to rearrange their business," *Golden State,* 414 U.S. at 182, 94 S.Ct. 414, remains unchanged, the countervailing interest is *not* protection of employees from a change in the employment relationship. Suits for delinquent fund contributions do not arise out of the employer-employee relationship; rather, they arise out of an employer's contractual obligation to make monetary contributions to an ERISA fund.

The Third Circuit has made precisely this distinction. As noted above, *supra* n. 23, *Einhorn v. Littlejohn* held that successor liability for delinquent ERISA fund contributions could be imposed after a merger. 155 F.3d at 209. But in so holding, the Court *distinguished Golden State* and *Livingston,* explaining,

> those cases dealt with the application of labor law concepts and the terms of a collective bargaining agreement to a corporation other than the signatory to the agreement. Here ... only the transfer of *a valid and ordinary debt is at issue*

---

27. In *Livingston,* the Court held that "a corporate employer must arbitrate with a union under a bargaining agreement between the union and another corporation which has merged with the employer." 376 U.S. 543, 544, 84 S.Ct. 909 (1964). However, the Court also made clear, "[w]e do not hold that in every case in which the ownership or corporate structure of an enterprise is changed the duty to arbitrate survives." *Id.* at 551, 84 S.Ct. 909.

*which just happens to have its genesis in the terms of a collective bargaining agreement.*

*Littlejohn,* 155 F.3d at 209 (emphasis added). Rather than relying on *Golden State* and *Livingston* to impose liability, the Court relied upon the "almost universally accepted state law principle that when two corporations merge, the surviving corporation assumes the liabilities of the extinct corporation." *Id.* at 209 (citing, *inter alia,* 15 Pa.C.S.A. § 1929(b); N.J.S.A. 14A:10-6(e); and Del.Code. Ann. Tit. 8, § 259(a)).

As *Littlejohn* explicitly recognizes, the unique employer-employee relationship governed by federal labor law and policy is not implicated in this case; an "ordinary debt" is the subject of the parties' dispute. 155 F.3d at 209. This fundamental difference alters the balance of equities.

Absent imposing successor liability on a company that purchases substantially all of the assets of a predecessor, a wrongfully discharged employee has no job to which he may be reinstated. But basic corporate law teaches that an ERISA fund can collect delinquent contributions in the absence of successor liability. Before the sale of substantially all of a company's assets, the seller company has assets and liabilities. After the sale, the seller has

cash and liabilities.[28] Indeed, for this very reason, an asset sale may *facilitate* collection of delinquent contributions—the seller's assets have been liquidated into cash that may be used to satisfy debts.[29] Thus, an ERISA fund simply does not need the same protections as an individual employee.[30]

Moreover, in cases such as this, in contrast to *Golden State,* the interests of businesses, the public, and individual employees often will be aligned in the balance of equities. When a company purchases the assets of another company with delinquent fund contributions (as opposed to an obligation to remedy unfair labor practices), the value of the debt may well exceed the value of the assets.[31] Imposing successor liability in that situation could discourage corporate transactions that might save a struggling business, along with employees' jobs.

*Polius v. Clark Equipment Company* makes a very similar point. 802 F.2d 75 (3d Cir.1986). In *Polius,* the Third Circuit rejected expanded successor liability in product liability cases. Declining to "jettison well-established corporate law," the Court explained why it would not adopt the "continuity of enterprise approach" to successor liability:

28. *See generally* 1-5C Eleanor Fox & Byron Fox, Corporate Acquisitions and Mergers § 5C.01 (Matthew Bender) (2009) ("An acquisition of assets entails the purchase, for any type of consideration, of all or substantially all of a corporation's assets in a transaction that is not in the usual and regular course of the transferor corporation's business. The acquiring corporation transfers its stock, cash or other consideration to the selling corporation, which conveys its assets to the acquiring corporation. Liabilities do not pass to the acquiring corporation except by specific conveyance.").

29. The Court respectfully disagrees with *Artistic Furniture*'s conclusion that "[a]bsent the imposition of successor liability, present and future employer participants in the union

pension plan will bear the burden of [the predecessor's] failure to pay its share." 920 F.2d at 1328. Absent successor liability, the *predecessor* bears the burden of its own debts.

30. For this reason, the Court also respectfully disagrees with *Artistic Furniture*'s assertion that "[t]he congressional policies underlying ERISA ... no less compel the imposition of successor liability than do the policies animating the NLRA, Title VII, or Section 1981." 920 F.2d at 1327.

31. *Contrast Artistic Furniture,* 920 F.2d at 1327 ("There is, of course, no relevant economic difference between the award of backpay or compensatory damages at issue in our previous successor liability cases and the delinquent contribution liability at issue here.").

Predictability is vital in the corporate field. Unforeseeable alterations in successor liability principles complicate transfers and necessarily increases transaction costs. Major economic decisions, critical to society, are best made in a climate of relative certainty and reasonable predictability.

The imposition of successor liability on a purchasing company long after the transfer of assets defeats the legitimate expectations the parties held during negotiation and sale. Another consequence that must be faced is that few opportunities would exist for the financially troubled company that wishes to cease business but has had its assets devalued by the extension of successor liability.

A company that cannot locate a buyer for all of its assets at a favorable price may be forced to sell its property piecemeal at a less advantageous figure. After dissolution, no successor would exist under any theory of successor liability, and in that event, the products liability plaintiff would still be without a collectable judgment. Thus, the benefits of alienability will have been lost to commerce with no commensurate benefit to plaintiffs.

*Polius*, 802 F.2d at 80, 83.

In *Littlejohn*, the Third Circuit looked to universal concepts of corporate law—not *Golden State* and *Livingston*—to craft

the federal common law of successor liability to be applied in that ERISA case. Guided by *Littlejohn*, and *Polius*, this Court must conclude that similar universal concepts of corporate law should supply the federal common law rule of successor liability in this case. Thus, *Artistic Furniture* conflicts both with sound reason and with related precedents in this Circuit, and this Court will not follow it. Instead, as set forth next, the Court applies the traditional common law rule to determine whether Ruberton may be held liable for Statewide's delinquent contributions.

**B.**

■■■ "Generally, at common law, when one company sells or transfers all its assets to another, the successor company does not embrace the liabilities of the predecessor simply because it succeeded to the predecessor's assets." *ALCOA v. Beazer East, Inc.*, 124 F.3d 551, 565 (3d Cir.1997) (internal citation and quotation omitted).[32] However, there are exceptions to the rule. Liability may be imposed: "(1) where the purchaser of assets expressly or impliedly assumes the liabilities of the transferor; (2) where the transaction amounts to a de facto merger; (3) where the purchasing corporation is merely a continuation of the transferor corporation; and (4) where the transaction is fraudulently intended to escape liability." *Id.* at 565.[33]

---

**32.** *See also Lefever v. K.P. Hovnanian Enters.*, 160 N.J. 307, 310, 734 A.2d 290 (1999) ("The general rule of corporate-successor liability is that when a company sells its assets to another company, the acquiring company is not liable for the debts and liabilities of the selling company simply because it has succeeded to the ownership of the assets of the seller."); 15 Fletcher Cyclopedia of the Law of Corporations § 7122 ("The general rule, which is well settled, is that where one company sells or otherwise transfers all its assets to another company, the latter is not liable for the debts and liabilities of the transferor.").

**33.** *See also Lefever*, 160 N.J. at 310, 734 A.2d 290 ("Traditionally, there have been only four exceptions: (1) the successor expressly or impliedly assumes the predecessor's liabilities; (2) there is an actual or de facto consolidation or merger of the seller and the purchaser; (3) the purchasing company is a mere continuation of the seller; or (4) the transaction is entered into fraudulently to escape liability."); 15 Fletcher Cyclopedia of the Law of Corporations § 7122 ("Exceptions to the general rule of nonliability in the event of a transfer of corporate assets include where there is an express agreement to assume the liabilities,

The only exception that might apply here is the mere continuation / de facto merger exception. *See Berg Chilling Sys., Inc. v. Hull Corp.*, 435 F.3d 455, 468 (3d Cir.2006) (following the "trend of the courts" in treating the mere continuation and de facto merger exceptions "identically.").[34] Factors relevant to the mere continuation / de facto merger analysis include: (1) continuity of ownership, management, personnel, physical location, assets and general business operations; (2) continuity of shareholders; (3) the seller corporation "ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible"; (4) "the purchasing corporation assumes those obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the seller corporation"; and (5) whether the purchaser holds itself out as the effective continuation of the seller. *Berg Chilling Sys.*, 435 F.3d at 468–69 (applying Pennsylvania law); *Marshak v. Treadwell*, 595 F.3d 478, 490, 2009 WL 1886153 at *8 (3d Cir. July 2, 2009) (applying New Jersey law).

The record does not support a finding that Ruberton was a continuation of Statewide. First, there was no identity of ownership between the two companies, nor was there identity of management. *See Berg Chilling Sys.*, 435 F.3d at 469 (noting that the continuity of ownership factor is often "critical to a successor liability claim."). Second, the undisputed record demonstrates that Statewide continued in existence after the asset sale, even renting equipment and personnel from Ruberton. Third, Ruberton assumed almost none of Statewide's obligations.[35] Lastly, the undisputed record demonstrates that Ruberton did not hold itself out to be a continuation of Statewide, rather, Rick Berenato testified, "[we (Ruberton) said to the customers,] you had this with Statewide ... we're willing to do it *in lieu of them* at the same price.... [B]asically we just explained to [the customers] that Statewide was primarily, in essence, out of business." (R. Berenato Dep. at 32–34)(emphasis added)

Based on this record, a reasonable factfinder could only conclude that Ruberton's acquisition of Statewide's assets was not a de facto merger. Accordingly, no exception to the common law rule of nonliability applies in this case, and Ruberton's Motion for Summary Judgment will be granted. Einhorn's Motion for Summary Judgment will be denied.

## IV.

For the foregoing reasons, the Court concludes that Ruberton may not be held liable as a successor to Statewide. Accordingly, Ruberton's Motion for Summary Judgment will be granted and Einhorn's Motion for Summary Judgment will be denied. The Court will issue an appropriate Order.

where an agreement to assume the liabilities can be implied, where there is a de facto consolidation or merger of the corporations, where the transaction was fraudulent, or where the purchasing company is a mere continuation of the selling company.").

34. The record is clear that Ruberton did not expressly, nor impliedly, assume the debt at issue. Nor does the record support a finding

that the asset sale was fraudulently intended to escape liability.

35. While it did assume one $160,000 outstanding balance owed on some heavy equipment, nothing in the record suggests that assuming this debt allowed for the uninterrupted continuation of normal business operations of Statewide.

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (Docket No. 124) AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Docket No. 125)**

This matter having appeared before the Court on Plaintiff Einhorn's Motion for Summary Judgment (Docket No. 124), and Defendant M.L. Ruberton Construction Company's ("Ruberton") Motion for Summary Judgment (Docket No. 125), the Court having considered the submissions of the parties, and for the reasons set forth in an Opinion issued by this Court on even date herewith, which findings of fact and conclusions of law are incorporated herein by reference, and for good cause appearing;

**IT IS** on this 26th day of October, 2009,

**ORDERED THAT:**

1. Plaintiff Einhorn's Motion (Docket # 124) is hereby **DENIED.**

2. (Docket # 125) is hereby **GRANTED.**